**UNITED STATES of America**

v.

**Charles J. ASH, Jr., Appellant.**

**No. 22340.**

United States Court of Appeals,
District of Columbia Circuit.

March 1, 1972.

Certiorari Granted June 12, 1972.
See 92 S.Ct. 2436.

**94**

Mr. Charles J. Ash, Jr. filed a brief pro se.

Mr. Jerome J. Dick, Washington, D. C. (appointed by this court) filed a brief as amicus curiae.

Messrs. Thomas A. Flannery, U. S. Atty., at the time the brief was filed, John A. Terry and William S. Block, Asst. U: S. Attys., were on the brief for appellee. Messrs. Roger E. Zuckerman, Harvey S. Price, and Robert C. Crimmins, Asst. U. S. Attys., also entered appearances for appellee.

Before BAZELON, Chief Judge, and WRIGHT, McGOWAN, TAMM, LEVENTHAL, ROBINSON, MacKINNON, ROBB and WILKEY, Circuit Judges, sitting *en banc*.

LEVENTHAL, Circuit Judge:

On April 1, 1966, appellant Charles J. Ash, Jr., and a co-defendant, John L. Bailey, were indicted on five counts relating to an armed robbery of the American Security and Trust Company, East Capitol Street Branch.[1] Ash was convicted by a jury on May 13, 1968, and in due course was sentenced to an effective term of five to fifteen years. The principal question presented by his appeal is whether his constitutional rights were violated by the introduction of certain pretrial photographic identifications obtained after arrest, and indeed after indictment, without notice to or presence of his counsel. It is fortunate for appellant that the issues concerning identification were raised in the brief filed by his appointed counsel before appellant sought and was granted leave to continue *pro se*. The points raised by appellant *pro se* have no merit.[2] But we find merit in the issues as to identification raised in the brief filed by counsel, continued by this court on an amicus curiae basis. We reverse the conviction and remand for further proceedings not inconsistent with this opinion.

---

1. Count one charged the crime of entering a federally insured bank with the intent to commit robbery therein, 18 U.S.C. § 2113 (a) ; counts two and four, robbing two tellers in violation of 18 U.S.C. § 2113 (a) ; counts three and five, robbing the same two tellers, this time in violation of 22 D.C.Code § 2901.

2. Appellant also contends that the trial judge erred in refusing to allow him to see the grand jury minutes, and in refusing to allow him to put on certain testimony. We find no error in either of these rulings. Although appellant himself was denied opportunity to examine the minutes, his attorney was permitted to see them. The excluded testimony constituted only collateral impeachment. The exclusion would not have been reversible error even if the testimony had been offered by counsel.

Counsel raised the issue of denial of speedy trial, referred to in Part IV of this opinion.

## I. FACTUAL BACKGROUND

On August 26, 1965, a gunman entered the bank, waved his gun in the air, and ordered everyone in the bank not to move. A few seconds later another man dashed through the lobby of the bank to the tellers' cages, scooped up some money and ran out again, followed by the gunman. The robbery took place in about three or four minutes. At trial Ash was identified as the gunman. A bank teller, Mrs. Ruby Paugh, said Ash looked similar to the gunman, but she could not be certain because she could not see his face in view of the stocking mask. Another teller, Mrs. Jean Major, who likewise was unable to see the gunman's face, said she believed Ash was the gunman, but was not absolutely certain. A bank customer, Joseph Taylor, said Ash "looks sort of like" the gunman but he could not be certain. This witness had observed the gunman for a few seconds as he entered the bank, before he donned his mask. There was also an identification of Ash by Betty Apple, who was seated in an automobile outside, and said that outside the bank neither man wore a mask. She admitted she only got a "fleeting glimpse" of them and was not able to see their full faces.

It may be interjected that although Bailey was also identified in court by Mrs. Apple, there was a hung jury as to him. The trial judge granted his motion for acquittal.

Since the only other proof against Ash was the testimony of an informer who was under indictment for other offenses, it becomes material to consider carefully issues pertaining to the identification testimony.

The trial began May 8, 1968.[3] In the morning the court held a pre-trial hearing to determine whether the showing of photographs to the witnesses rendered their testimony inadmissible.

At this hearing it developed that at the time of the crime none of the four identification witnesses was able to give the police a description of the gunman's facial characteristics. The description given to police at the time of the robbery was not in terms of facial features but rather, e. g., by height and weight—that the gunman was tall and slim. The police call for the gunman described him only as Negro male, 19 years old, six feet tall, 165 pounds, thin build.

At the hearing FBI Special Agent Patrick Markowvich testified that on February 3, 1966, some 5 months after the crime, he interviewed Mrs. Paugh, Mrs. Major, Mrs. Apple and Mr. Taylor concerning the robbery in order "[t]o attempt to effect an identification." The agent showed each of them a group of black and white police mug shots of the faces of five Negro males, including appellant and Bailey, all of "generally the same age, height and weight as Mr. Bailey and Mr. Ash." Apparently, Mr. Ash's photograph was included because of information received from one Clarence McFarland, an informer charged with other crimes (see note 7, infra). Agent Markowvich testified that all four witnesses selected the photograph of appellant as the gunman. On cross-examination he testified "[t]hey were not positive in the identification." Asked if any of them was positive, he cited Mr. Taylor—who had seen the gunman before he donned his mask—and testified that "Mr. Taylor said that to the best of his belief" Ash was the gunman "but he could say positively if he could see him in person." (Tr. 16). Mrs. Apple said the photo "looked like" Ash but she wasn't sure. Mrs. Apple identified Bailey's photograph as that of the second robber. A few weeks later Mrs. Apple also pointed out Bailey to police in a corridor of the General Sessions Building.

---

3. The long delay was due to a number of factors. Appellant filed numerous *pro se* motions in the trial court, and changed counsel no fewer than four times. Appellant also underwent two psychiatric examinations at St. Elizabeths to determine his competency to stand trial. Trial was also continued on a number of occasions because of the unavailability of Government counsel.

Special Agent Hugh Berry of the FBI testified that on May 7, 1968, the day before trial, together with the prosecutor, he visited, and showed five color pictures to, Mrs. Paugh, Mrs. Major and Mrs. Apple. Each of these witnesses picked out appellant's picture, but none selected Bailey's. On the morning of trial agent Berry showed the same photos to Mr. Taylor, who was unable to make an identification.

Of the five color photographs, only appellant's and Bailey's were full-length; they were pictured standing next to a pole, possibly a height marker, which had attached to it a plaque bearing police identification numbers. These numbers were covered up by the exhibit sticker at trial,[4] but apparently were uncovered when the photos were shown to the four witnesses. Of the three remaining pictures, one terminated at the subject's thigh, one at the waist, and another at the lower chest. None of these three photographs bore police identification numbers.

One of the eyewitnesses, Mrs. Paugh, also testified. She said that she could not surely identify anyone, and that all she could do, when questioned or shown photographs, was to make an identification "as to the general build of the person." She stated that the color photographs shown her the day before had not had the effect of refreshing her recollection or recreating in her mind an image of the person she saw at the time of the robbery.

The judge ruled that the four prosecution witnesses would be permitted to make an identification of appellant at

trial[5]—and they gave testimony as set forth above. None of them was questioned on direct concerning the photographs. Bailey's counsel was interested in bringing out that Mrs. Apple had not identified Bailey's color photograph. Counsel for Ash objected to any procedure that would "make the proffer to show pictures of Ash." Accordingly Bailey's counsel confined his questioning of Mrs. Apple to establishing that Mrs. Apple had been shown five color photographs. Later, Bailey's counsel elicited from FBI agent Berry that Mrs. Apple had made no identification on being shown a color photograph of Bailey.

When counsel for Bailey offered the Bailey photograph, the prosecutor insisted on admission of all five color photographs shown to Mrs. Apple. Counsel for Ash objected (Tr. 413): "I would object to Mr. Ash's picture. I don't want to see Mr. Stanford [Bailey's counsel] getting bad marks for my client." In view of this objection, Bailey's counsel withdrew his offer of a photographic exhibit, being content to rely on testimony that Bailey's photograph had not been identified. In due course such testimony was adduced, and he announced that he had completed his questions of the FBI agent (Tr. 413–15). But at this point the prosecutor interjected and insisted that the photographic evidence should be admitted. In due course he made a formal offer (Tr. 416), and the judge ruled it would be admitted (Tr. 416). The court's ruling on the color photographs was plainly based on an assumption contrary to our view, developed later, that the admission of the

4. To avoid prejudice under the ruling of Barnes v. United States, 124 U.S.App. D.C. 318, 365 F.2d 509 (1966).

5. At this juncture the judge ruled that the Government had met its burden of showing that the identification was based on observation of the suspect other than the intervening photographic presentation. The following day, when pre-trial questioning of Mrs. Apple by Bailey's counsel went into the subject of color photographs, apparently to elicit that they were sugges-

tive, the judge sustained the prosecutor's objection, saying that "the question is whether the identification was unnecessarily suggestive," and that this was a question for the trial court. We do not see how this comment justifies the limitation of the testimony, but it suffices at this point to note that the judge did not make a finding that the color photographs were not unduly suggestive, and if anything the finding of independent source rested on an assumption that they were unduly suggestive.

color photograph of Ash was constitutionally impermissible, and prejudicial error.[6]

The Government also presented in its direct case the testimony of Clarence McFarland, who was then serving a sentence in connection with another robbery. Mr. McFarland, whose extensive criminal record was brought out on direct examination, testified that on August 25, 1966, the day before the American Security robbery, appellant had asked him to help rob the bank, but McFarland refused to go along. McFarland stated that he next saw appellant on August 27, sitting with Bailey at Cecilia's Lounge on Seventh and T Streets. According to McFarland appellant told him that he had robbed the bank of approximately $3,100, and that he was angry with Bailey for leaving him in the bank. McFarland was cross-examined as to whether he had been promised certain "favors" in connection with several cases pending against him. The defense later called an Assistant United States Attorney who testified, *inter alia,* that he had indicated he would testify before the parole board in McFarland's behalf.[7]

## II. PROBLEM OF SUGGESTIVENESS IN THE VIEWING OF THE COLOR PHOTOGRAPHS

█ Appellant claims that the pretrial photographic identifications, and the suggestive circumstances surrounding them, tainted the identification testimony of the four eyewitnesses and thus deprived appellant of due process. Stovall v. Denno, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967). This claim requires a showing that "the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." Simmons v. United States, 390 U.S. 377, 384, 88 S.Ct. 967, 971, 19 L.Ed.2d 1247 (1968).

There are undeniably troublesome aspects concerning the photographic identifications. Because three of the five black and white photos were unaccountably lost (see note 18), we cannot make a detailed analysis of the February 1966 identifications. However it is not without significance, in terms of perspective, that in seeking an identification with black and white photographs in February 1966, five months after the crime, the agents used facial mug shots as the vehicle for that identification, when in fact the witnesses had described the robbers to the police only in terms of height, weight, age and build. Though the identifications were "not positive," and one of the witnesses expressly besought an opportunity to see the subjects in person, no arrangements were made for a lineup.

As to the May 1968 identifications, from color photographs shown on the eve of trial, the pictures are present in the record before us. It will be recalled that

---

6. If the trial judge had been in accord with our constitutional premise, we are confident that he would—and we hold that he should—have sustained the objection of Ash's counsel, and not have ruled, as he did, that the photographs were admissible because the subject of photographic identification had been "opened up" by "the defense," meaning counsel for Bailey.

The threshold objection of Ash's counsel was not waived, in our view, by his accession—in the face of the court's ruling—to a procedure whereby (a) all five photographs would be admitted ("that might avoid prejudice against Ash"), and (b) be admitted by stipulation—to resolve a squabble whether the photographs, already held admissible, should be offered by Bailey's counsel or the prosecutor.

7. It appears from the testimony of these witnesses that McFarland had been before the grand jury with regard to five separate offenses, in addition to his bank robbery, and had not been indicted on any of them, including one in which he had confessed guilt. The Assistant United States Attorney had arranged to have McFarland transferred from the D.C. Jail to a local jail in Rockville, Maryland, and in addition had helped McFarland's wife move from Southeast Washington to an apartment near the parochial school that McFarland's children were due to attend.

the only description at the time of arrest was in terms of being tall and of thin build. The color photographs in the record show that both Ash and Bailey are tall and slender, while the other three men whose photographs were used appear to be of stocky build. Despite the witnesses' reliance at the time of the crime on description in terms of bodily characteristics, only Ash and Bailey are pictured full-length; the other three subjects are cut off at mid-thigh, waist, and mid-chest, respectively. Finally, the photographs of Ash and Bailey, shown standing next to height poles, bear police identification numbers, while there are no such numbers on the other three photographs.

Without at the moment fixing the ultimate legal consequences it cannot be gainsaid that there are at the very least strong elements of suggestiveness in this color photo confrontation. The possibility of suggestiveness is not negatived by the witness's weak response, for as Judge MacKinnon cogently pointed out —in the course of holding unduly suggestive a policeman's presentation of colored photographs to the witness in the course of preparing for trial—"[T]he focus is on the photographic display itself and not on the reaction of the witness to it." United States v. Gambrill, 146 U.S.App. D.C. 72, 449 F.2d 1148 (1971). And the elements of suggestiveness cannot be justified on the ground of necessity, like that urged in *Stovall*. With the February 1966 photographic (black and white) identification yielding only tentative results, there was full opportunity to hold a lineup, organized so as to avoid any suggestiveness, during the two pre-trial years when appellant was in detention.

Certainly the elements of suggestiveness were strong enough so that it cannot be assumed that there was no undue suggestiveness in the absence of explicit findings by the trial court. As we have already noted (fn. 5), the court made no such finding, and if anything its independent source determination rested on an assumption of undue suggestiveness.

If it were established that there was a legal defect in the showing of the color photographs the day before trial then as noted below (see fn. 20), it would be hard to accept the conclusion that they did not affect the in-court identification.

We are aware that there are indications offsetting in part the inference of undue suggestiveness. But they are hardly conclusive. The identifications at trial were weak, and in fact no stronger than those given two years before on the basis of the mug shots. In some cases the weakness of in-court identification may be a factor tending to indicate that pre-trial identification, though improper, failed to influence the witness's testimony. Here, however, it was almost three years since the events in the bank in August 1966, events that passed swiftly, with appellant's face seen by only two witnesses and by each of them only fleetingly. The color photographs in May 1968 can hardly be justified on the ground that the witnesses' 1968 recollection had been reinforced by the showing of the black and white photographs in February 1966, even assuming that was entirely proper, since that was not only remote in time but was a showing of facial mug shots to witnesses who had not given a description in terms of facial characteristics. In the absence of intervening reinforcement by the color photos the in-court identification might well have been diluted to less than even a scintilla of substance. That the color photos may have been material in enabling the witnesses to provide a weak identification of the gunman in court is not negatived by the fact that the witnesses had such a void in the recollection of the unarmed offender that it was not revived by the color photographs.

We could not reject appellant's substantial claim of impermissible suggestiveness without a more thorough hearing and more definite findings than this record presents. But we do not remand for this purpose because there is another objection to the photographic identification that establishes the need for reversal.

### III. APPELLANT'S CONSTITUTIONAL RIGHTS WERE DENIED BY GOVERNMENT'S SHOWING OF COLOR PHOTOGRAPHS TO WITNESSES WITHOUT ATTENDANCE OF COUNSEL

We do not find it necessary to determine whether appellant's Fifth Amendment rights were violated because the color photographs were impermissibly suggestive. In the circumstances of this case, defendant's constitutional right to counsel at critical stages of the prosecution was violated when the Government, having him in custody, and having failed to arrange a corporeal lineup, made a photographic presentation to witnesses without attendance of counsel. The Government's insistence on admission of these color photographs at the trial produced reversible error.

A corporeal lineup is a "critical stage" of the prosecution at which defendant is entitled to the aid of counsel, even though held prior to trial or even to the filing of formal charges. United States v. Wade, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967). This court has been explicit to confirm the latitude and authority of the police to secure a suspect's participation in a timely lineup, with counsel present, even though he is eligible for release on recognizance or bail, precisely because this is the means that best combines and assures both effectiveness and integrity of law enforcement investigation procedures. Williams v. United States, 136 U.S.App.D.C. 158, 161, 419 F.2d 740, 743 (en banc 1969); United States v. Greene, 139 U.S.App.D.C. 9, 429 F.2d 193 (1970); Adams v. United States, 130 U.S.App. D.C. 203, 399 F.2d 574 (1968), cert. denied *sub nom* Roots v. United States, 393 U.S. 1067, 89 S.Ct. 722, 21 L.Ed.2d 710 (1969).

In this case the Government did not avail itself of the opportunity it had, following defendant's arrest, to hold a corporeal lineup. The presentation of color photographs subsequent to arrest— indeed on the eve of trial—was like a lineup as being a critical stage of the prosecution, requiring presence of counsel for Ash, within the meaning of *Wade*.

It is contended that *Wade* has no application whatever to pre-trial photographic identifications. We are aware that a majority of the courts that have ruled on the question have held *Wade* inapplicable to photographic viewings and identification.[8] Some courts have mentioned the question without deciding it.[9] Other decisions hold that *Wade* is applicable, or at least may be applicable in some measure to photographic identification.[10]

---

8. *See, e. g.*, United States v. Bennett, 409 F.2d 888 (2d Cir.), cert. denied *sub nom* Haywood v. United States, 396 U.S. 852, 90 S.Ct. 113, 24 L.Ed.2d 101 (1969); United States v. Ballard, 423 F.2d 127 (5th Cir. 1970); United States v. Robinson, 406 F.2d 64 (7th Cir.), cert. denied 395 U.S. 926, 89 S.Ct. 1783, 23 L.Ed.2d 243 (1969); McGee v. United States, 402 F.2d 434 (10th Cir. 1968), cert. denied 394 U.S. 908, 89 S.Ct. 1020, 22 L.Ed.2d 220 (1969); Baldwin v. State, 5 Md.App. 22, 245 A.2d 98 (1968); State v. Stamey, 3 N.C.App. 200, 164 S.E.2d 547 (1968); People v. Lawrence, 4 Cal.3d 273, 93 Cal. Rptr. 204, 481 P.2d 212.

9. Some courts have refused to decide the issue, either because the identification occurred prior to *Wade*, or there was evidence of independent source or the record did not present the issue adequately. United States v. Butler, 426 F.2d 1275 (1st Cir. 1970); United States v. Marson, 408 F.2d 644 (4th Cir. 1968) (Winter, J., concurring and dissenting), cert. denied 393 U.S. 1056, 89 S.Ct. 695, 21 L.Ed.2d 698 (1969); United States v. Quarles, 387 F.2d 551 (4th Cir. 1967), cert. denied 391 U.S. 922, 88 S.Ct. 1815, 20 L.Ed.2d 659 (1969); United States v. Valez, 431 F.2d 622 (8th Cir. 1970).

10. United States v. Zeiler, 427 F.2d 1305 (3d Cir. 1970); Commonwealth of Pennsylvania v. Whiting, 439 Pa. 205, 266 A.2d 738, cert. denied, 400 U.S. 919, 91 S.Ct. 173, 27 L.Ed.2d 159 (1970). See also United States v. Marson, *supra*, note 9, 408 F.2d at 651 (Winter, J., concurring and dissenting); Thompson v. State, 85 Nev. 134, 451 P.2d 704, cert. denied, 396 U.S. 893, 90 S.Ct. 189, 24 L.Ed.2d 170 (1969).

While we are aware of the view of a majority of the courts that have considered the matter, we are equally aware of instances in which the view advanced by a majority of circuit courts of appeals was rejected, and the contrary view of one or two circuits was finally upheld, by the Supreme Court. See, e. g., Kaufman v. United States, 394 U.S. 217, 220, 89 S.Ct. 1068, 22 L.Ed.2d 227 (1969) (sustaining the position taken by the 4th and 10th Circuits, and rejecting the position taken by the 2d, 3d, 5th, 6th, 7th, 9th and D.C. Circuits) ; Simmons v. United States, 390 U.S. 377, 392, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968) (sustaining the position taken by the D.C. Circuit; rejecting the position taken by the 4th, 5th, 7th, 8th and 10th Circuits) ; Putnam v. Commissioner of Internal Revenue, 352 U.S. 82, 84, 77 S.Ct. 175, 1 L.Ed.2d 144 (1956). The opinions of other appellate courts merit careful attention and consideration, and this we have accorded, but they are not controlling as precedent. Bound by our oath of office to give independent consideration to the constitutional claims, we conclude they should be sustained.

 We conclude that the sound rule prescribes that in general, subject to certain exceptions, *Wade* and its requirement of presence of counsel, are applicable to a Government exhibition of photographs of a person in custody for an offense to witnesses called to identify the person who committed the offense.

The Third Circuit, on reconsideration of the problem, held in *Zeiler* (cited fn. 10) that once a defendant is taken into custody, he is entitled to have counsel present at any subsequent photographic lineup. While we think the rule is subject to exceptions, we agree with *Zeiler's* analysis that the dangers of mistaken identification from uncounseled lineup identifications set forth in *Wade* are applicable in large measure to photographic as well as corporeal identifications. These include, notably, the possibilities of suggestive influence or mistake—particularly where witnesses had little or no opportunity for detailed observation during the crime; the difficulty of reconstructing suggestivity—even greater when the defendant is not even present; the tendency of a witness's identification, once given under these circumstances, to be frozen. While these difficulties may be somewhat mitigated by preserving the photograph shown, it may also be said that a photograph can preserve the record of a lineup; yet this does not justify a lineup without coun-

---

*Zeiler* involved two trials. As to each trial, reversal was held required because the prosecution had elicited the previous identification of Zeiler during the pretrial exhibition of photographs: "This error in itself requires reversal of both convictions." 427 F.2d at 1307.

As to the conviction obtained in the "second trial" held in June 1968, the court remanded for a new trial at which the witness "shall not be permitted to identify the accused," because it inspected the photographs shown to the witnesses, concluded they were "unnecessarily suggestive," and thought the District Court's determination that the prosecutor had established that the in-court identification had not been influenced by the prior improper photographic confrontation "was not a permissible conclusion." (427 F.2d at 1308).

As to the conviction in the "first trial" held in January, 1968 (Criminal No. 67-186), the court did not know "what photographs were shown to the identifying witnesses in the absence of counsel." It

therefore remanded for a hearing on the admissibility at retrial of in-court identification. In a subsequent opinion, following the remand, the court determined that the Government had established by clear and convincing evidence that in-court identifications by the witnesses involved would "have an origin independent of any photographic identification made outside the presence of counsel." United States v. Zeiler, 447 F.2d 993 (3d Cir. 1971). For purposes of determining this issue, the court naturally considered whether the photographic identification was suggestive. However, testimony of the photographic identification itself was impermissible— and required a new trial whether or not "suggestive"—because of the court's rule that "once an accused is taken into custody, he is entitled under the Sixth Amendment to have counsel present whenever law enforcement authorities confront witnesses with a series of photographs for identification." 447 F.2d at 994.

sel. The same may be said of the opportunity to examine the participants as to what went on in the course of the identification, whether at lineup or on photograph. Sometimes this may suffice to bring out all pertinent facts, even at a lineup, but this would not suffice under *Wade* to offset the constitutional infringement wrought by proceeding without counsel. The presence of counsel avoids possibilities of suggestiveness in the manner of presentation that are otherwise ineradicable.

The Pennsylvania Supreme Court, following *Zeiler*, stated in its *Whiting* opinion (cited in note 10):

"As for the photographic lineup employed in the instant case, the necessity for counsel at that confrontation, is implicit in *Wade*, which factually concerned a corporeal lineup. *Wade* cannot be undercut simply by substituting pictures for people, nor can the police prepare a witness for the lineup by privately showing the witness pictures of the accused."

We note that the Supreme Court denied certiorari in *Whiting* (see note 10). We note, too, that in its brief to the Supreme Court in the *Wade* case the Government argued (Br. 34, October Term 1966, at p. 7): "There is no meaningful difference between a witness' pretrial identification from photographs and a similar identification made at a lineup."

The precedents contrary to *Zeiler* are to some extent conclusionary, rather than analytical, and to some extent based on erroneous premises. The most analytical is United States v. Bennett, *supra*, wherein Judge Friendly concluded that the Sixth Amendment has no application to "out-of-court proceedings where the defendant himself is not present." 409 F.2d at 899. This is, we think, too narrow a reading of this Sixth Amendment right. It is Judge Friendly's view that a major purpose behind the right to counsel is to protect the defendant from errors that he himself might make if he appeared in court alone, and that this rationale has no relevance to situations where the defendant is not present. See 409 F.2d at 900. However, *Wade* itself demonstrates the possibility of other forms of prejudice, resulting not from actions of the defendant but from manipulations by others, that require counsel to be present. The fact that in one instance the manipulation may be of the defendant's body, as in a lineup, and in another instance may be of his photograph, does not remove the need for protection.

Nor do we agree with the assertion in some decisions (*supra* note 8), that the application of *Wade* to photographic viewings held under the auspices of a prosecutor is tantamount to a requirement of counsel at every conference between the prosecutor and Government witnesses. As this court has noted, there is a crucial distinction between these two situations. The prosecutor cannot introduce testimony on direct of the statements given by a witness in an earlier interview with the prosecutor. But he may introduce the witness's prior identification. United States v. Kirby, 138 U.S.App.D.C. 340, 342, n. 2, 427 F.2d 610, 612, n. 2 (1970). If the witness's photographic confrontation was lawful, as the Government now contends, it would not only have independent standing as evidence, but indeed, as this court has already pointed out en banc, the testimony of a witness's pre-trial identification is likely to have far more weight with the jury than the taken-for-granted in-court identification. Clemons v. United States, 133 U.S.App. D.C. 27, 40, 408 F.2d 1230, 1243 (en banc 1968), cert. denied, 394 U.S. 964, 89 S.Ct. 1318, 22 L.Ed.2d 567 (1969). If the pre-trial identification is not deficient, and the witness is available for cross-examination, it is considered to have greater probative value than the in-court identification. *Id.* To say that the nature of a photographic viewing inherently establishes it as less than a critical stage of the prosecution is to blink reality.

There are instances in which a photographic exhibition—even though

an event capable of being adduced at trial—is too preliminary and preparatory to be regarded as a critical stage of the prosecution requiring attendance of defense counsel. Certainly when a case is in the pre-arrest investigative stage there is justification for photographic viewings, assuming no undue suggestiveness, Simmons v. United States, 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968). There is obvious need in terms of effective police investigation to ask the victim or other witness to view photograph books organized by the police in terms of modus operandi and nature of offense.

&#9646; The Court recognized in *Wade,* 388 U.S. at 227–228, 87 S.Ct. at 1932–1933, 18 L.Ed.2d 1149, that certain "preparatory step[s] in the gathering of the prosecution's evidence . . . are not critical stages." [11] This court has held that photographic viewings at the pre-arrest stage are not subject to the requirement of *Wade* and may be conducted in the absence of counsel or substitute counsel for the suspect. United States v. Kirby, 138 U.S.App. D.C. 340, 427 F.2d 610 (1970). In United States v. Hamilton, 137 U.S.App. D.C. 89, 91, n. 6, 420 F.2d 1292, 1294, n. 6 (1969), we stated: "Counsel at an identification session designed to narrow the field of suspects, at a time when no one has been charged and there is no one in particular to represent, is an obvious impracticality." In *Kirby,* however, we left open (see 427 F.2d at 612, n. 2) the question, whether "a right of counsel for photographic identification might be urged as to defendants who have been taken into custody on cause of having committed the offense."

&#9646; Essentially we are in accord with the premise of *Zeiler* that "[t]he

considerations that led the court in *Wade* to guarantee the right of counsel at line-ups apply equally to photographic identifications conducted after the defendant is in custody," see 427 F.2d at 1307. There may be a limited exception to this requirement, derived from special circumstances, as in exceptional cases where there is an on-going investigation and time is of the essence, even though, as *Zeiler* noted, the need for photographs as a tool of investigation "is in most cases unnecessary" after the accused has been taken into custody. (See 427 F.2d 1307, note 3.) To the extent that there may be an exception it would be limited to a case of special circumstances, as in a case of investigative necessity where even the slight delay involved in attendance of counsel or substitute counsel would not be feasible without jeopardizing the effectiveness and fairness of continuing investigation. The police have a responsibility to proceed, taking the identification process as a whole, so that such an uncounseled photographic confrontation does not unnecessarily undercut the reliability of the subsequent counseled lineup.

&#9646; There is no possible basis for invocation of the exception, for special circumstances like investigative necessity, in a case like that of *Ash,* where the Government officials failed to use their opportunity to arrange a corporeal lineup prior to indictment, and the photographic exhibition, without notice to counsel, to the eyewitnesses known to the police since the crime came not only after defendant's arrest but after the indictment had issued and trial counsel had been appointed, and the day before the trial was to start. These facts not only decisively eliminate the possibility that this case comes within the excep-

---

11. Since a photographic lineup is as much subject to the risk of influence and mistake as a corporeal lineup, it is clearly distinguishable from other investigative techniques, such as the analysis of fingerprints, blood samples and the like, which the Supreme Court in *Wade* held to be mere "preparatory steps" not subject to the Sixth Amendment right to counsel.

*Wade, supra,* 388 U.S. at 227, 87 S.Ct. 1926, 18 L.Ed.2d 1149. These modes of circumstantial proof, depending as they do on scientific and technical comparisons, lack the risk of error, or at least undetectable error, that attends the more subjective comparison between memory and photograph.

tion rather than the general rule requiring counsel at post-arrest exhibition of photographs, but they establish an independent requirement of counsel even if *Wade* were not generally applicable to post-arrest exhibition of photographs; for it has been clear since Massiah v. United States, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964), that the existence of authority in the police to continue investigations of suspects becomes subject to a constitutional obligation that precludes the use of evidence gained from him after indictment in the absence of his counsel.

 We think it appropriate to develop considerations underlying our emphasis on the failure of the Government to arrange a corporeal lineup. We begin this discussion by noting, as the Supreme Court recognized in *Simmons,* that while a photographic viewing plays a useful role in effective investigation, particularly in the early stages, it inherently involves inescapable "hazards," (390 U.S. at 384, 88 S.Ct. 967, 19 L.Ed. 2d 1247), and may reflect significant shortfalls in reliability even when not so impermissibly suggestive as to rise to the level of denial of due process, see 390 U.S. at 386, n. 6, 88 S.Ct. 967, 19 L.Ed. 2d 1247. An identification of a photograph, even out of a group, is manifestly of lesser stature and reliability than identification of the suspect himself out of a corporeal lineup. The reliability of a corporeal lineup is of course heightened by the attendance of the counsel or substitute counsel required under *Wade.* Such counsel have an appropriate role in remarking on any suggestivity in the lineup "and proposing changes to avoid suggestive features," see United States v. Allen, 133 U.S.App.D.C. 84, 408 F.2d 1287, 1289 (1969). This role is particularly meaningful in conjunction with that part of *Allen* which puts forward

the concept that the description of the suspect given by the witness to the police be available, see Spriggs v. Wilson, 136 U.S.App.D.C. 177, 419 F.2d 759 (1969). The law enforcement authorities also have an interest in avoiding detention or protracted detention of the innocent, and their exoneration is indeed one of the reasons set forth in *Simmons* (390 U.S. at 384, 88 S.Ct. 967, 19 L.Ed. 2d 1247) for pre-arrest scrutiny of photographs.

This court has an abiding concern for and interest in ensuring a combination of fairness and intelligent and effective techniques in law enforcement. That is the hallmark of a decent society concerned with both order and justice. It has led us in the past to countenance personal confrontations that were both suggestive and in the absence of counsel when the circumstances, close in time and place to the offense, enhanced reliability for law enforcement and thus enhanced fairness.[12] This results not only in a "balance of pertinent interests," [13] but in mutually reinforcing goals, as the same procedures result in both release of the innocent and enhanced opportunity to renew the search for and to apprehend the guilty, serving in both respects to further the proper interest of all citizens. These concerns stand at zenith for this court, which has jurisdiction and responsibility to supervise the administration of justice concerning the broad sweep of serious street crimes that beset the Nation's capital, crimes in which identity is typically the central question.

Our judicial concern is for an approach to identification procedures that combines fairness with police responsibility and effectiveness. The police are likewise concerned with such a sound approach. We observe with approval that pertinent D.C. Metropolitan Police Reg-

---

12. Russell v. United States, 133 U.S.App. D.C. 77, 79–81, 408 F.2d 1280, 1282–1284, cert. denied, 395 U.S. 928, 89 S.Ct. 1786, 23 L.Ed.2d 245 (1969), citing Wise v. United States, 127 U.S.App.D.C. 279, 282–283, 383 F.2d 206, 209–210 (1967),

cert. denied, 390 U.S. 964, 88 S.Ct. 1069, 19 L.Ed.2d 1164 (1968).

13. See Wise v. United States, *supra* note 12, 127 U.S.App.D.C. at 283, 383 F.2d at 210.

ulations have instructions geared both to fairness of photographic identification and to assuring a follow-on corporeal lineup.[14] The police concern with fair and timely identification procedures assures identifications that are (a) more reliable and (b) admissible in court— and with more impact than any in-court identification.[15]

It was the combined interests of fairness and effective police administration that led this court to approve judicial orders, on application of the prosecutor, that reinforced the long-standing police recognition of the need for corporeal lineups for persons taken into custody on photographic identification,[16] by requiring the attendance at a police-conducted lineup of persons released on recognizance or bail.[17] Orders may likewise be issued at the request of defense counsel, as has been done by various district judges in pretrial procedures.[18]

We do not consider in this opinion whether or to what extent its principle should be applicable in case of a photographic showing subsequent to a lineup. We make this clear because the judges concurring in *Ash* have differed in their votes in United States v. Brown, Proctor and Williams, No. 24,452, 149 U.S. App.D.C. ——, 461 F.2d 134, a companion case to *Ash*, opinion filed this day. The dissenting opinions in *Brown* set forth the views of some of the judges concurring in this *Ash* opinion that its principles should in logic and fairness be extended to that case. Judge McGowan and I concluded that safeguards adequate for constitutional right of presence of counsel were present in *Brown*.[19] But the differences among us relate to cases

14. The D.C. Metropolitan Police regulations dealing with photographic identification provide that a suspect's photograph must be grouped with at least eight others of the same general description, that adequate records of the photographs must be kept, and that each witness must view the photographs out of the immediate presence of other witnesses. They also provide that the police shall notify the prosecutor so that arrangements can be made in order to assure that the photographic identification is followed by a corporeal lineup. Memorandum Order on Procedures for Obtaining Pretrial Eyewitness Identification, May 15, 1970.

15. The fair pre-trial identification procedures also reduce the possibility of any constitutional interposition against an in-court identification, and of a claim that this must override the provision, in 18 U.S.C. § 3502, for the admissibility of in-court identification by eyewitnesses.

An in-court identification is taken for granted by the jury, especially since the trial setting itself focuses on the defendant at counsel table with a "strong suggestiveness," see United States v. Gambrill, *supra*, 449 F.2d at 1158.

16. See, *e. g.*, Dorman v. United States, 140 U.S.App.D.C. 313, 325, 435 F.2d 385, 398 (en banc 1970).

17. Williams v. United States (Coleman v. United States) 136 U.S.App.D.C. 158, 161, 419 F.2d 740, 743 (en banc 1969); Adams v. United States, 130 U.S.App.D.C. 203, 399 F.2d 574 (1968).

18. United States v. McNair, 140 U.S.App. D.C. 26, 433 F.2d 1132 (1970). The judge may order that the lineup be conducted, of course in the presence of counsel, by the police, and thus take advantage of facilities of space, photography and personnel geared to fair lineup procedures. If the prosecution has good reason for deferring disclosure of the names of identification witnesses, the court may issue an appropriate protective order, or may consider lineups conducted on the eve of trial or during its course.

19. Judge McGowan and I would stress the presence of defense counsel at the prior corporeal lineup, as protecting against identification errors attributable to mischance, clumsiness or excess police zeal, and the limitation of the *Brown* ruling to presentation of a photograph of such a counseled lineup, to a witness who attended that lineup, by the prosecuting attorney. We considered the possibility of prejudice to be minimal and the sound functioning of the prosecuting attorney's preparation for trial to be material.

We were aware that there can be no absolute guarantee against possibility of prejudice to the defendant, but concluded its minimal quality was underscored by the prosecuting attorney's awareness of the need for a complete and candid exposition of any process resulting in a change from the failure of the witness to make the identification when defense counsel was present at the lineup. It is perhaps not immaterial that the Brown tral, following our en banc order of March

other than *Ash*, and do not qualify the concurrence, of all the judges voting for reversal of the Ash conviction, in the *Ash* opinion's statement of the principles which we conclude require reversal.

Another case where there was a corporeal lineup was United States v. Hines & Ware, No. 23,281, 147 U.S.App.D.C. 249, 455 F.2d 1317 (1971). This court there decided that when a witness has already identified the defendant at a counseled lineup the prosecutor may, without advance notification of defense counsel, review the identification already made by the witness through the use of photographs, to refresh his memory, in a session preparatory for his testimony at a court hearing. The same rule was also applied as to a witness whose prior identification of defendant was at a confrontation that was not attended by counsel because it came within the exception of Russell v. United States, (cited *supra*, note 12). In these cases, where the witness had already made a reliable physical identification, there was a safeguard lacking in *Brown*, where the witness failed to identify the defendant when she attended counseled lineup. But *Brown* is limited—as has been noted—to the use of a photograph of the counseled lineup.

## IV. CONCLUSION AND REMAND ORDER

Although there was no requirement of counsel at the presentation of black and white photographs in February, 1966, these were facial photographs, shown to witnesses who had not given the police any description of facial features. The identifications were "not positive," and indeed the witness who was most clear only made an identification to the best of his belief, saying he could be more positive if he could see defendant in person. Yet there was no arrangement for a corporeal lineup. In 1968, on the day before trial, long past the time when active investigation of the case had ceased, the Government showed color photographs to the witnesses, without notice to defense counsel. We hold this 1968 showing was a "critical stage" of the prosecution, at which defense counsel's presence was required unless waived. There was prejudicial error at the trial when the prosecutor insisted that the jury see the color photograph of Ash, entrenching that pre-trial identification, and notwithstanding the objection of counsel for Ash pointing out the prejudice to Ash the trial court ruled it would be received in evidence.

Appellant is entitled to a new trial at which the court will exclude prosecution evidence of the identifications made on the color photographs. At that trial the prosecution may tender witnesses to make in-court identifications of Ash. If it had been necessary to decide that issue as to the trial already held we doubt that we could sustain a finding of independent source.[20]

15, 1971, permitting the photographic identification, resulted in an acquittal.

It is the premise of our *Brown* ruling that the problem of impedance of justice by steering is so insubstantial in the case of a prosecuting attorney—who has standing as an officer of the court, apart from the deterrence inherent in his jeopardizing of his professional career—as not to warrant the hindrance on the straightforward preparation for trial by busy prosecuting attorneys that would be involved in a second attendance by defense counsel at a showing of a photograph of a lineup already attended by defense counsel at the corporeal stage.

20. The Government has the burden of proving independent source by clear and convincing evidence. Here the witnesses could refer only to the observations at the time of the crime, 33 months before, which, because of disguise or fleeting character of the observations, were of such a nature that the description given by the witnesses to the police made no reference whatever to facial characteristics. In view of such considerations, and the absence of a lineup, it is hard to see how the Government can be held to have shown, by clear and convincing evidence, that these color photographs did not affect the in-court identification made one day later. (Anthony) Long v. United States, 137 U.S.App.D.C. 311, 316, 424 F.2d 799, 804 (1969), United States v. Gambrill, *supra*.

But the situation may be different as to in-court identification testimony offered at a new trial,[21] if determinations as to independent source are based on careful analysis of the issues (see fns. 10 and 20), including findings as to suggestiveness or not, and careful examination of the proposed witnesses at a pretrial hearing.

If a new trial is held, there would have to be a determination of appellant's claim that his constitutional right of speedy trial was violatd by the delay between the April 1966 indictment and the May 8, 1969, trial. Although there appears to be considerable substance in the Government's claim that this was primarily due to appellant's own doings, including noncooperation with defense counsel, in view of the skimpy record before us we conclude this issue should be left for further exploration by the trial judge if a new trial is sought.

We reverse and remand for further proceedings not inconsistent with this opinion.

So ordered.

BAZELON, Chief Judge:

While I concur in the opinion of the Court in *Ash* in its statement of the principles calling for reversal of the conviction, I am of the view, for the reasons set forth in my opinion dissenting in *Brown* and concurring in *Ash*, that logic and fairness require application of those principles to all persons in custody.

The opinion of Chief Judge Bazelon concurring in United States v. Ash, No.

22,340, and dissenting in the companion case of United States v. Brown, Proctor & Williams, No. 24,452, opinion filed today, is found at page —— of 149 U.S.App. D.C., at page 145 of 461 F.2d of United States v. Brown, Proctor & Williams.

WILKEY, Circuit Judge (dissenting):

There are two major elements of Judge Leventhal's opinion for the majority which give rise to this dissent.

First, the Sixth Amendment rationale of *Wade* [1] does not apply to *Ash*, and the effort to rest the majority opinion on a faulty foundation has produced a distorted result almost unique among decided cases.

Second, Fifth Amendment principles applicable in this type case, recognized and established by decisions of the Supreme Court, our own and sister circuits, have not been correctly applied to the facts here.

I. *The Sixth Amendment Rationale of* WADE *Does Not Apply to* ASH

A. *The Display of Photographs to Witnesses by the Prosecutor in Preparation for Trial is Not a "Critical Stage of the Prosecution" Requiring the Presence of Defendant's Counsel*

As we noted in United States v. Brown, Proctor and Williams, No. 24,-452, opinion filed this day, throughout part IV of the majority opinion in *Wade* there runs a two-factor rationale for the required presence of counsel at a lineup: (1) the possibility of suggestivity, which

---

The trial court did not address itself to these considerations when it made an independent source ruling. If it had been necessary to decide that issue, we would at a minimum have remanded for elucidation by the trial court of the basis of its ruling.

21. There may be differences as to the facts: The showing of the color photographs would not be so close to trial. On the other hand, if the 1968 in-court identification was tainted, that—together with the 1968 color·photograph presentation— might be found to affect any new in-court identification. The trial judge would be

obligated to approach any determination on the issue of independent source only after careful examination of each of the proposed witnesses.

There may be a difference in the legal situation due to the subsequent enactment of 18 U.S.C. § 3502. We intend no comment either on the applicability vel non of this statute to a retrial following reversal of a conviction prior to its enactment, or to possible constitutional limitations on its application.

1. United States v. Wade, 388 U.S. 218, 228ff., 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967).

may be averted by the presence of defendant's counsel; and (2) the capability of reconstruction at trial, if defendant's counsel is present during the identification process.

The majority opinion here enumerates three principal "dangers of mistaken identification from uncounseled lineup identifications set forth in *Wade*," and concludes that these

are applicable in large measure to photographic as well as corporeal identifications. These include, notably, [1] the possibilities of suggestive influence or mistake—particularly where witness had little or no opportunity for detailed observation during the crime; [2] the difficulty of reconstructing suggestivity—even greater when the defendant is not even present; [3] the tendency of a witness's identification, once given under these circumstances, to be frozen.[2]

Before turning to the great majority of cases in other circuits which disagree with this reasoning and result, it might be helpful to analyze Judge Leventhal's interpretation of the rationale of *Wade* and the three dangers of mistaken identification, as applied to photographs:

1. The "possibilities of suggestive influence or mistake" are present in any identification procedure. Furthermore, the viewing of *any* photograph of the accused at *any* time is likely to add an immeasurable quantum to the certainty of a witness's identification, but these

trace residuals the Supreme Court seemed willing to accept as not "impermissibly suggestive." This possibility would apply equally to *pre*-arrest photo identification.

It is noteworthy that in *Wade*, where the Court remanded the case for a hearing as to whether the in-trial identification had an independent untainted origin, the Court, in describing the ways in which the independent recollection of the witness could be proved, listed "the identification by picture of the defendant prior to the lineup."[3] This is a plain inference that pre-trial photographic identification—without the presence of counsel—is an accepted investigatory or preparatory technique and is relevant proof of the validity of the in-trial identification.[4]

Yet a contrary conclusion forms the basis of Judge Leventhal's opinion here. "The presentation of color photographs subsequent to arrest—indeed on the eve of trial—was like a lineup as being a critical stage of the prosecution, requiring presence of counsel for Ash, within the meaning of *Wade*."[5] His opinion goes on to recognize "[w]e are aware that a majority of the courts that have ruled on the question have held *Wade* inapplicable to photographic viewings and identification."[6] There are fundamental reasons why this should be so.

Aside from the ease of reconstructing a photographic identification (see I.B. and I.C. *infra*), a photographic identifi-

---

2. Judge Leventhal's majority opinion, at 100 (hereafter cited as "Majority Opinion").

3. 388 U.S. at 241, 87 S.Ct. at 1940, 18 L.Ed.2d 1149.

4. See Simmons v. United States, 390 U.S. 377, 384, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968), discussed in fuller detail in II.A., *infra*. This court and the District Court have acted on this basis. Recently in United States v. Garner (United States v. Parker), 142 U.S.App.D.C. 15, 439 F.2d 525 (1970), cert. den., 402 U.S. 930, 92 S.Ct. 701, 30 L.Ed.2d 727 (1971), where the trial court had relied on a pre-trial photographic identification as establishing an independent source for a courtroom

identification, on the state of the record we remanded in order that the pre-lineup photo be identified and made part of the record, and for the District Judge to amplify or modify his finding thereon. We thus assumed as a matter of established law that a proper finding of a valid pre-trial photo identification is relevant support for the in-trial identification. So did the Second Circuit in United States v. Bennett, 409 F.2d 888, 900 (1969), in a case in which the defendant was already under arrest at the time of displaying the photographs.

5. Majority Opinion, at 99.

6. *Id.*, at 99.

cation lacks many of the elements of a lineup which caused the Supreme Court to characterize a lineup as a "confrontation" and a "critical stage of the prosecution." A lineup is a little drama, stretching over an appreciable span of time. The accused is there in the flesh, three-dimensional and always full-length. Further, he isn't merely there, he acts. He walks on stage, he blinks in the glare of lights, he turns and twists, often muttering asides to those sharing the spotlight. He can be required to utter significant words, to turn a profile or back, to walk back and forth, to doff one costume and don another. All the while the potentially identifying witness is watching, a prosecuting attorney and a police detective at his elbow, ready to record the witness' every word and reaction.[7]

Obviously the defendant's counsel ought to be present throughout the drama of the lineup, within earshot of the witness, likewise making notes, ready to object to anything which would unnaturally, and therefore unfairly, single out his client from among other suspects or plain "fillers" in the lineup. The witness at a lineup is usually nervous, afraid of being spotted by the perpetrator of the crime if he is there, and all too frequently incapable thereafter of recalling any of the significant details of the lineup which took place over a period of time.

Compare the atmosphere in which the witnesses in this case made their photo identification of Ash—and failed to identify co-defendant Bailey—in their customary places of business or homes. In such an atmosphere, a witness need focus at that time on one thing only, the photographs, and be able to recall

only one additional thing, any hint of suggestion in the way the photos were displayed or in the conversation of the official conducting the interview. Both are easy of reconstruction afterwards, as in this case. The photos were preserved, the witness' recollections of the relatively brief circumstances of the interviews were thoroughly plumbed by defense counsel before and at trial.

This was no "confrontation" with Ash, this was no "critical stage of the prosecution" requiring the presence of his counsel, and requiring the reversal of Ash's conviction because his counsel was absent. Nor by any other criteria of *Wade* is this a "critical stage" of the prosecution; rather, it is fair to appraise the situation as one carrying "minimal risk that his counsel's absence at such stage[s] might derogate from his right to a fair trial." [8]

Gilbert v. California [9] is authority and provides the analogy for this position. There the police had secured handwriting samples from the accused, after arrest and in the absence of counsel, not yet appointed. The Court distinguished the lineup and the rationale of *Wade*:

The taking of the exemplars was not a "critical" stage of the criminal proceedings entitling petitioner to the assistance of counsel. Putting aside the fact that the exemplars were taken before the indictment and appointment of counsel, there is minimal risk that the absence of counsel might derogate from his right to a fair trial. Cf. United States v. Wade, *supra*. If, for some reason, an unrepresentative exemplar is taken, this can be brought out and corrected through the adversary process at trial since the accused can make an unlimited number

7. Because so much more takes place at a lineup than at a photographic identification, I disagree with the assertion of the majority that "the same may be said of the opportunity to examine the participants as to what went on in the course of the identification, whether at lineup or on photograph." (Majority opinion, at 101) The little drama of a lineup seems to me much more difficult of reconstruc-

tion by examination of participants than does the photographic identification. Thus I see a greater need for the participation of counsel in the case of the lineup than in the case of the photographic identification.

8. 388 U.S. at 228, 87 S.Ct. at 1933.

9. 388 U.S. 263, 87 S.Ct. 1951, 18 L.Ed.2d 1178 (1967).

of additional exemplars for analysis and comparison by government and defense handwriting experts. Thus, "the accused has the opportunity for a meaningful confrontation of the [State's] case at trial through the ordinary processes of cross-examination of the [State's] expert [handwriting] witnesses and the presentation of the evidence of his own [handwriting] experts." United States v. Wade, *supra* [388 U.S.,] at 227–228, [87 S.Ct. 1932–1933].[10]

Pre-trial photographic and handwriting identifications are obviously subject to similar cross-examination by defense counsel at trial. The position of defense counsel in dealing with these two matters at trial is quite similar, and his position with regard to a lineup is quite different from either. I submit that the rationale applicable to Ash's photographs is the rationale of *Gilbert* re handwriting samples, not that of *Wade* re lineups.

That the pre-trial identification is provable and producible at trial Judge Leventhal takes as a reason for requiring a different rule from that applicable to other phases of a pre-trial interview.[11] True, such pre-trial identification can be offered as independent evidence—*but*, before it can be received, on request defendant's counsel must have the opportunity outside the presence of the jury for a searching cross-examination of all the prosecution's identification witnesses. He can explore not only all the details of the pre-trial photographic identification, but also the exact opportunity each witness had to observe at the scene of the crime, previous opportunities each witness may have had to see the accused, the description each witness gave the police at the time, and the current strength of each witness' capability of identifying the accused. In so doing competent defense counsel usually manages to extract every important detail of the crime which con-

stitutes the prosecution's case in chief. Armed with this information, defense counsel at trial knows precisely where to attack the prosecution's evidence, where to press the cross-examination, where to tread lightly or not at all. In regard to no other phase of the prosecution's case does the defense have these opportunities and advantages.

No better example of the advantage given defendant's counsel by such a pre-trial hearing could be found than this case of Ash and Bailey. The capacity of defense counsel to reconstruct every detail of the pre-trial photo identification has been proved beyond peradventure, and likewise the capacity of counsel to utilize other information obtained. Now to reverse the conviction of Ash because his counsel was not present at the prosecutor's interview with his witnesses the day before trial, at which time the photos were displayed, is to go far beyond *Wade* or any other decision, and is indeed to "blink at reality" in the administration of justice.

There are basic considerations stemming from the fundamental structure of our system of justice which preclude the adoption of any such broad rule to the effect that during his trial preparation a prosecutor may not show photographs to the witnesses in the absence of defense counsel. Our system of justice is an adversary system; with all of the constitutional safeguards granted defendants, it necessarily must be. The display of the photographs to the witnesses in *Ash* was part of counsel's testing their recollection of pertinent facts of the case before putting them on the stand for questioning. At this point there is no more opportunity for suggestion as to what the witness's testimony should be in regard to identification than there is on any other facts of the case to which the witness might testify. A witness' identification from a photograph carries less danger of improper suggestion than other types of

10. *Id.*, at 267, 87 S.Ct. at 1953–1954.

11. Majority Opinion, at 101, citing United States v. Kirby, 138 U.S.App.D.C. 340, 342n., 427 F.2d 610, 612n. (1970).

testimony, because the photograph is a visible, producible record of at least part of the interview, as it was in this case. For centuries, prosecutors and defense counsel have had the opportunity in private pre-trial interviews with witnesses improperly to influence their testimony. When that has been shown to have been done, the trial courts have known what to do about the matter, but no court has yet held that the preventive remedy for such a possibility of improper influence is to place opposing counsel at every interview with the witness.

The remedy prescribed by the Supreme Court in *Wade*, where defense counsel had not been present at the line-up, was to remand to the trial court to conduct a hearing to determine if the witness's in-court identification had an independent origin. That type hearing has already been held for Ash, and for this and other reasons fully analyzed under I.C. *infra*, the rationale of *Wade* does not apply to *Ash*.

2. Judge Leventhal's second danger, the "difficulty of reconstructing suggestivity," appears to me to be the overpowering reason for which the Supreme Court in *Wade* designated the lineup as a critical stage of the prosecution,[12] calling for the presence of defendant's counsel under the Sixth Amendment. It is undeniable that as compared with a lineup, the difficulty of reconstructing suggestivity in a photographic identification is much, much less. The record of this case amply so demonstrates, as is discussed in detail under parts I.B. and I.C. *infra*.

3. Judge Leventhal's third danger, "the tendency of a witness's identification, once given under these circumstances, to be frozen" would be equally (or more) true in the *presence* of defendant's counsel. Furthermore, it would be true of all identification procedures, and as noted above, the Supreme Court manifested no concern over these trace residuals of strengthened identification.[13] I do not read *Wade* as resting on this third ground at all, and since the presence or absence of counsel would have no effect, I fail to see why it provides a Sixth Amendment rationale for reversing the conviction of Ash.

Turning now to the authorities, Judge Leventhal's majority opinion relies heavily on the Third Circuit's first decision in United States v. Zeiler,[14] and considers that "the precedents contrary to *Zeiler* are to some extent conclusionary, rather than analytical, and to some extent based on erroneous premises."[15] On the Sixth Amendment question involved in *Ash*, the popularity of conclusionary decisions among the United States Courts of Appeals and the state courts is impressive indeed. Decisions of the Second, Fourth, Fifth, Sixth, Ninth, and Tenth Circuits have explicitly and unequivocally taken the position that *Wade* does *not* apply to photographic identifications which occur *after* arrest.[16] Forty-two federal judges

---

12. Likewise, as under Judge Leventhal's first point, the same danger is present in a *pre*-arrest photographic identification as post arrest. While the appointment of counsel is easier to arrange in the post-arrest situation, the Supreme Court in *Wade* did not seem to be concerned about any danger in pre- or post-arrest photographic identification. See text accompanying note 3, *supra*.

13. *Wade, supra*, 388 U.S. at 241, 87 S.Ct. 1926.

14. 427 F.2d 1305 (3rd Cir. 1970) (hereafter, Zeiler I). See Majority Opinion, at 100.

15. Majority Opinion, at 101.

16. *Second Circuit*: United States v. Bennett, 409 F.2d 888, cert. denied, *sub nom.* Jessup v. United States, 396 U.S. 852, 90 S.Ct. 117, 24 L.Ed.2d 101 (1969); United States v. Baker, 419 F.2d 83 (1969); United States v. Sanchez, 422 F.2d 1198, 1200 (1970); United States v. Roth, 430 F.2d 1137 (1970), cert. denied, 400 U.S. 1021, 91 S.Ct. 583, 27 L.Ed. 2d 633 (1971); United States v. Fitzpatrick, 437 F.2d 19, 25 (1970); United States v. Mojica, 442 F.2d 920, 921 (1971); *Fourth Circuit*: United States v. Marson, 408 F.2d 644 (1968); United States v. Collins, 416 F.2d 696 (1969); United States v. Canty, 430 F.2d 1332 (1970); *Fifth Circuit*: United States v.

have held that *Wade* does not apply to photographic identification.[17] Only the Third Circuit has reached a decision to the contrary, subsequent to a decision in accord with the other circuits,[18] and followed by a decision in the same case demonstrating that the real concern is not the right to counsel but the possibility of suggestiveness.[19]

Virtually all of those state courts which have had occasion to consider *Wade* have likewise rejected its application to photographic identification. California,[20] Illinois,[21] Maryland,[22] Mis-

Ballard, 423 F.2d 127 (1970); *Sixth Circuit*: United States v. Serio, 440 F.2d 827 (1971); *Ninth Circuit*: United States v. Sartain, 422 F.2d 387 (1970); United States v. Smith, 423 F.2d 1290; cert. denied, 398 U.S. 930, 90 S.Ct. 1825, 26 L.Ed.2d 94 (1970); Allen v. Rhay, 431 F.2d 1160, 1167 (1970); United States v. Edwards, 433 F.2d 357, 358 (1970); United States v. Goetluck, 433 F.2d 971 (1970); United States v. Roustio, 435 F.2d 923 (1970); United States v. Williams, 436 F.2d 1166, 1169 (1970); United States v. Fowler, 439 F.2d 133 (1971); *Tenth Circuits*: Rech v. United States, 410 F.2d 1131, cert. denied, 396 U.S. 970, 90 S.Ct. 457, 24 L.Ed.2d 438 (1969); United States v. Von Roeder, 435 F.2d 1004, 1010 (1971).

The issue of whether defense counsel is required at *post*-arrest photographic identification does not seem to have yet arisen in the Seventh Circuit, but it has been held on the authority of Simmons v. United States, 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968), that the absence of counsel at a photographic identification when the accused is not yet in custody is no barrier to the reception of such identification in evidence at trial. United States v. Robinson, 406 F.2d 64 (7th Cir.), cert. denied, 395 U.S. 926, 89 S.Ct. 1783, 23 L.Ed.2d 243 (1969).

17. *Second Circuit*: Circuit Judges Anderson, Friendly, Lumbard, Smith, Kaufman, Feinberg, and Waterman, together with District Judges Frankel, Zampano, and Palmieri; *Fourth Circuit*: Circuit Judges Haynsworth, Bryan, and Butzner; *Fifth Circuit*: Circuit Judges Wisdom, Simpson and Clark; *Sixth Circuit*: Circuit Judges Peck, Brooks, and Kent. *Ninth Circuit*: Circuit Judges Hufstedler, Wright, Chambers, Browning, Barnes, Hamley and Carter, joined by Senior Circuit Judge Tuttle of the Fifth Circuit sitting by designation in *Smith, supra*; Circuit Judges Trask, Hamlin, Ely, Duniway, and Kilkenny, joined by District Judge Taylor, sitting by designation in *Edwards, supra*; *Tenth Circuit*: Circuit Judges Pickett, Breitenstein, Hill, and Holloway, joined by Senior Circuit Judge Jones of the Fifth Circuit sitting by designation in *Rech, supra*; Circuit Judge Seth, joined by District Judge Templar sitting by designation in *Von Roeder, supra*; *Eastern District of Pennsylvania*: District Judge Masterson; *District of Arizona*: District Judge Craig.

18. In two other circuits, the First and Eighth, the issue of the applicability of *Wade* to photographic identification was raised but not decided. United States v. Butler, 426 F.2d 1275 (1st Cir. 1970), held that the in-court identifications were independently based, and therefore it was unnecessary to reach the Sixth Amendment *Wade* argument. In United States v. Valez, 431 F.2d 622 (8th Cir. 1970), the court remanded for a plenary hearing on all the circumstances of the lineup, whether counsel was present, and whether the witness had an independent source for in-court identification. The court also footnoted the evidence of pre-lineup photographic identifications, remarking without indicating a preference for the divergent views on the required presence of counsel at post-custody photographic identifications, citing *Zeiler I* for one view and three cases from the Second, Fifth, and Tenth Circuits for the contrary view.

19. United States v. Zeiler, 447 F.2d 993 (3d Cir., 1971) (hereafter, *Zeiler II*).

20. People v. Lawrence, 4 Cal.3d 273, 93 Cal.Rptr. 204, 481 P.2d 212; People v. Stuller, 10 Cal.App.3d 582, 89 Cal.Rptr. 158 (1970); People v. Wesley, 10 Cal. App.3d 902, 89 Cal.Rptr. 377 (1970); cf. People v. Williams, 6 Cal.App.3d 752, 86 Cal.Rptr. 379 (1970).

21. People v. Martin, 47 Ill.2d 331, 265 N.E.2d 685, 688 (1970); People v. Holiday, 47 Ill.2d 300, 265 N.E.2d 634, 637 (1970).

22. Smith and Samuels v. State, 6 Md.App. 59, 250 A.2d 285 (1969); Johnson v. State, 9 Md.App. 327, 264 A.2d 280 (1970); Crenshaw v. State, 13 Md.App. 361, 283 A.2d 423.

sissippi,[23] North Carolina,[24] Washington,[25] Wisconsin,[26] Delaware, Massachusetts, and Florida [27] have all held that the rationale of *Wade* only applies where a defendant is present and is confronted by a witness. Pennsylvania,[28] influenced by the Third Circuit, (and possibly Nevada) [29] alone illuminates the path the majority takes here.

In one of the earlier circuit decisions after *Wade*, Judge Friendly correctly appraised the limits of *Wade*: " . . . to require that defense counsel be allowed or appointed to attend out-of-court proceedings where the defendant himself is not present would press the Sixth Amendment beyond any previous boundary." [30] In United States v. Cunningham [31] a witness at a lineup was interrogated outside the presence of both the accused and his counsel as to the witness's identification. The Fourth Circuit held this procedure entirely proper, Judge Winter saying:

> Here, the lineup was terminated and witnesses were being interrogated outside of the presence of suspects. Confrontation had occurred and was terminated. By the rationale of *Wade* and *Gilbert*, counsel was no longer required unless we were prepared to hold that defense counsel must be present whenever the government interrogates a witness whose testimony

23. Stevenson v. Mississippi, 244 So.2d 30, 33 (Miss.1971).

24. State *v.* Accor, 277 N.C. 65, 175 S.E. 2d 583, 592–593 (1970).

25. Washington v. Searcy, 4 Wash.App. 860, 484 P.2d 417, 419–420 (1971).

26. Kain v. State, 48 Wis.2d 71, 179 N.W. 2d 777, 782 (1970).

27. Reed v. Delaware, 281 A.2d 142 (Del. Sup.Ct.1971) ; Commonwealth v. Geraway, 355 Mass. 433, 245 N.E.2d 423, 427–428 (1969) ; Staten v. State, 248 So.2d 697 (Fla.App.1971). *See also* McClain v. State, 247 Ark. 33, 444 S.W.2d 99, 102–104 (1969) ; *but see* Cox v. State, 219 So.2d 762, 765 (Fla.App.1969) ; People v. Rowell, 14 Mich.App. 190, 165 N.W. 2d 423, 426 (1968) (concurring opinion).

28. Commonwealth v. Whiting, 439 Pa. 205, 266 A.2d 738, cert. denied, 400 U.S. 919, 91 S.Ct. 173, 27 L.Ed.2d 159 (1970).

29. Thompson v. State, 85 Nev. 134, 451 P.2d 704, 706 (1969) ; Carmichel v. State, 86 Nev. 205, 467 P.2d 108 (1970).

We do not think that the Nevada Supreme Court holdings support the rule enunciated by the majority here. In both Thompson v. State, 85 Nev. 134, 451 P.2d 704 (1969) and Carmichel v. State, 86 Nev. 205, 467 P.2d 108 (1970), after due notice was taken of the constitutional requirements, the errors, if any, were held harmless and the convictions affirmed. In *Thompson* the Nevada Supreme Court registered a view completely consistent with this writer's dissent in the case at bar :

> We would not require counsel at photographic identification proceedings while the suspect is in custody if local law enforcement authorities would but preserve competently in the legal sense the photographs that are displayed to witnesses, provide guidelines for proper photographic identification procedures, and follow these guidelines. If the pictures are preserved and presented in court at subsequent proceedings with the same foundation as other similar evidence, defense counsel will be able to intelligently cross-examine the witnesses at trial. The guidelines would provide against improper suggestion which could not be cured by cross-examination.
>
> In this case no one was sure that the photographs, other than appellant's, were the same photographs which were used at the pretrial identification. The difficulties of cross-examination and the possibilities of irreparable suggestion are apparent.

451 P.2d at 707.

30. United States v. Bennett, 409 F.2d 888, 899 (2nd Cir. 1969). In considering Judge Friendly's view in *Bennett*, Judge Leventhal seems to consider that other possible forms of prejudice were recognized in *Wade* and required counsel to be present. Majority Opinion, at 101. The need for protection by the presence of counsel is largely dissipated if the circumstances of the identification can be reconstructed. As amply demonstrated in I.B. and I.C., *infra*, this was well done in the case at bar, and it was the impossibility of so doing in *Wade* that principally concerned the Supreme Court.

31. 423 F.2d 1269 (4th Cir. 1970).

may be used as part of the government's case at trial.[32]

The Supreme Court of California recently differentiated "confrontation," as the United States Supreme Court has used the term, from photographic identifications, in a case in which defendant's counsel was not present either at the showing of the photograph or the lineup:

> In *Wade, Gilbert,* and *Stovall,* the police exhibited the accused to witnesses in person. At such corporeal exhibitions . . . [t]he witness observes the suspect in person from a short distance performing the very acts the criminal did during the perpetration of the crime. At photographic identification proceedings, however, the accused is not present and the witness observes only static poses of those pictured. . . . We conclude, therefore, that the showing of photographs of the accused to a witness is not a confrontation or exhibition as those words are used in *Wade* and *Gilbert.* , . .[33]

While the Third Circuit's decision in *Zeiler I, supra,* out of the innumerable decisions on identification subsequent to *Wade,* is the *only* U. S. court decision reaching the same result on a rationale similar to the majority's here, I suggest even the majority's reliance on *Zeiler I* may be misplaced. While Judge Leventhal apparently deems *Zeiler I* more analytical[34] than the other circuit and state decisions, the analysis in *Zeiler I* was not sufficiently detailed to mention the same circuit's year-previous decision in United States v. Conway[35] reaching a contrary result. Hence there is no explanation by the court of the differing results in the two cases. Judge Leventhal implies that *Zeiler I* was so decided because the identification was post-arrest. In *Conway* the photographic identification was *post*-arrest, pre-indictment, apparently counsel had not been assigned, and no lineup was ever held.[36] The Third Circuit held the presence of counsel was not required by the Sixth Amendment as interpreted by *Wade,* nor was there any Fifth Amendment violation under *Simmons* and *Stovall.* In *Zeiler I* the photographic identification was also post-arrest, also pre-indictment, but counsel had been ap-

32. *Id.,* 423 F.2d at 1274.

33. People v. Lawrence, 4 Cal.3d 273, 278, 93 Cal.Rptr. 204, 207, 481 P.2d 212, 215. The three dissenting justices did so on grounds not applicable here.
First, the record clearly demonstrates that the photographic identification procedure in question was undertaken with the conscious purpose of evading the requirements of *Wade* and *Gilbert.* . . . Second, . . . it is improper to resort to photographic identification procedures after arrest when, as in the instant case, the authorities have failed to demonstrate the need to utilize such an inherently less reliable method rather than a corporeal lineup with full constitutional protections. *Id.,* 4 Cal.3d at 281, 93 Cal.Rptr. at 209, 481 P.2d at 217.

34. For an opinion in accord with *Zeiler I* which I submit could quite properly be classified as "conclusionary," *see* Reed v. Anderson, 329 F.Supp. 15, 1971, U.S. District Court Delaware. Reed came before the District Court after the Delaware Supreme Court had affirmed Reed's con-

viction, the latter court ignoring the Third Circuit's holding in *Zeiler I, supra,* and declining to extend the *Wade* rule to a witness' out-of-court examination and identification of photographs of the accused. Reed v. State of Delaware, 281 A.2d 142 (Del.Sup.Ct.1971). The Delaware Supreme Court had aligned itself with what the U.S. District Court termed a "rather one-sided split of authority" that there is no right to counsel at a post-arrest showing of photos at which the defendant is not present. Reed v. Anderson, *supra.* Mimeograph Opinion, at 10, 9 CrL, at 2324. However, the U.S. District Court (before *Zeiler II*) found itself compelled to grant habeas corpus relief to Reed under the Third Circuit's holding in *Zeiler I.* In so doing, however, the U.S. District Court gave strong hints that its conclusion was compelled by *Zeiler I* and that its own unrestricted analysis might have reached a different result, on the strong side of the "rather one-sided split of authority."

35. 415 F.2d 158 (3rd Cir. 1969).

36. 415 F.2d at 162–163.

pointed, and a lineup had been definitely scheduled. The last factor loomed large in the Third Circuit's rationale.

> A witness once induced by such a suggestive confrontation into making a mistaken identification is extremely unlikely later to change his mind. . . . the constitutional safeguards that *Wade* guaranteed for lineups may be completely nullified if the police are able privately to confront witnesses *prior to the lineup* with suggestive photographs.[37]

The facts of *Ash* are quite different. Ash was arrested a year and a half before *Wade* was decided. No lineup was ever scheduled. *There is yet no court decision holding a lineup is constitutionally required.* The display of the photographs giving rise to the majority's reversal of this case occurred solely in the course of the prosecuting attorney's normal preparation for trial in interviewing his witnesses. There is no contention whatsoever in the case at bar that the prosecuting attorney, the FBI, or the police sought to avoid any constitutional requirement.

It will not do to dismiss this impressively long list of decisions, this "one-sided split of authority," holding squarely that the requirement of counsel at a lineup in *Wade* does not apply to post-arrest photographic identifications, with any deprecatingly descriptive adjectives. While "weight of authority" may be sometimes a slippery rock on which to stand, and while courts must give heed to the better reasoned cases, nevertheless, one decision in the Third Circuit at Philadelphia, followed in the Pennsylvania court at Harrisburg, preceded by an as yet unreconciled decision in the same Circuit, and followed by another decision in the same case reaching a contrary ultimate result, is hardly enough to weigh against the multitude of decisions elsewhere. Too many courts, too many judges, federal and state, have held that *Wade* does not apply in situations comparable to that of the case at bar for this court to ignore what is now the established interpretation of *Wade*. For an obvious related reason, the task of analyzing the non-application of *Wade* in the vari-hued fact situations represented in this multitude of decisions is more wisely done by considering the rationale of *Wade* itself applied to *Ash*, as is done in Part I.C. *infra.*

> B. *The Majority Opinion's fully developed analysis of the alleged Fifth Amendment violation proves the absence of a Sixth Amendment violation.*

An inherent refutation to the validity of the majority opinion on the Sixth Amendment right to counsel (Part III) is found in the preceding portion (Part II) of Judge Leventhal's opinion dealing with Fifth Amendment due process violations. As noted, along with the prevention of possible suggestivity, the *Wade* rationale for requiring the presence of counsel rests primarily on the inability to reconstruct at trial any suggestivity unless defendant's counsel was present at the lineup.[38] The fact that Judge Leventhal is able to write an opinion developing so fully and in such detail alleged violations of due process establishes that the presence of counsel at the photographic identification would have been of no additional value, and therefore the Sixth Amendment ground of the opinion, the one relied on for reversal, is not valid. The rationale of *Wade* simply does not logically cover the *Ash* situation.

Judge Leventhal is able to write an opinion developing the alleged violations of due process, in spite of the absence of counsel at the photographic exhibition, because the circumstances surrounding photographic identification by a witness *do* have the capacity to be pre-

---

37. 427 F.2d at 1306–1307 (emphasis supplied). *Cf.,* the reason advanced by the three dissenting judges in People v. Lawrence, *supra,* n. 33, where the record clearly showed an intent to evade the requirements of *Wade.*

38. See I.A., *supra.*

served for examination at trial and on appeal. What would have been added by the presence of counsel? Suppose the defendant's counsel had found the photographs unfair in comparison and therefore suggestive to the witnesses? Would he have been able to do any more at the pre-trial hearing, or at the trial itself, or on this appeal, if he had been there? The examination of the photographs themselves, cross-examination by counsel at the pre-trial hearing, additional examination at trial with the benefit of the pre-trial hearing outside the presence of the jury—all of this enabled the two defendants' counsel to bring out every facet of possible violation of due process.

I submit that a photographic exhibition to a witness in the absence of the defendant is simply not a critical stage at which defense counsel's presence is or should be required by the rationale of *Wade*. Nothing better proves this non-critical character of this stage of the prosecution's preparation than the explicit detail of Part II of the majority opinion dealing with the alleged Fifth Amendment due process violations.

C. *The Sixth Amendment right to counsel in relation to photographic and in-court identification.*

1. *Analysis of Wade*

Here it is necessary to take a close look at the ultimate evil the Court was seeking to prevent or cure in *Wade*. The ultimate evil is infusing a taint in a witness' testimony by a suggestive lineup, substituting for the eyewitness' recollection of the offender the image of the accused derived from an improper lineup or other identification procedure. It is not the absence of defendant's counsel which is capable of producing tainted testimony either of the lineup identification itself or in court later, only a suggestive improper lineup or other identification procedure may color the witness' testimony. The presence of counsel at the lineup may or may not

have the effect of removing suggestive features (the police are under no obligation to accept the criticisms of defendant's counsel), but counsel's presence does enable him intelligently to attack both the in-court and the pre-trial lineup identification if offered. *This is what had been denied Wade's counsel.*

Presented with the situation in *Wade*, where not only had defendant's counsel not been present at the lineup but the trial court had not conducted a pre-trial hearing to determine if the lineup had been suggestive and, if so, if the eyewitnesses had an independent origin which could validate their identifications; assuming because of the absence of counsel that the lineup had been improperly suggestive, the Supreme Court remanded for such a hearing. The Court did not remand for another lineup at which counsel should be present, but remanded to determine independent origin, because the ultimate evil with which the Court was concerned was altered testimony. The Court found the denial of a right to counsel at the lineup a violation of the Sixth Amendment, but this violation itself would not be a producing cause of colored testimony. The producing cause of altered testimony *could be* a suggestive lineup or other improper identification procedures, hence the "cure" was for the trial court to hold a hearing to ascertain if, assuming because of the absence of counsel that the lineup had been improperly suggestive, the witnesses had an independent origin for their in-court testimony.[39]

In summary, the rationale of the *Wade-Stovall-Gilbert* trilogy is that the producing cause of altered testimony of an eye-witness is a suggestive lineup or other improper identification procedure. But where the circumstances of the identification procedure are simple of reconstruction, as is the case with a photographic identification, there is no need for counsel's presence, and the pre-trial hearing at which defense counsel can fully explore all avenues is suffi-

---

39. 388 U.S. at 241–242, 37 S.Ct. 1926, 18 L.Ed.2d 1149.

cient to equip counsel to protect his client at trial. Even in *Wade*, where no counsel was present at the lineup (described as a "critical" stage of the prosecution) the trial court was instructed to reinstate the judgment of conviction if the trial court found an independent origin to validate the witnesses' testimony. The evil the Court sought to exorcise was altered testimony; in regard to this the absence or presence of counsel· was neither cause nor cure.

Taking the foregoing into account, it is important to distinguish between Fifth and Sixth Amendment violations and the resulting questions raised in regard to identifications. If the allegation is a Fifth Amendment due process violation because of a suggestive identification procedure, the inquiry at any hearing on the allegation is, first, whether the identification procedure was in fact impermissibly suggestive, and if it was, then second, whether the prosecution can overcome this by showing an independent origin from which the witness *could* have made an identification without the improper suggestion.[40] If the allegation is a Sixth Amendment violation because of a denial of defendant's right to counsel, the question is first whether defendant was denied counsel's presence at a critical stage of the prosecution. In *Wade* the Supreme Court held that a lineup was a critical stage of the prosecution, and that answered Question One. Logically Question Two would seem to be whether the lineup was impermissibly suggestive so as to bar in-trial identification (no evidence of lineup identification was offered in *Wade*), but the Supreme Court considered at length the handicaps defendant's counsel would be under in establishing all the circumstances of a lineup, and apparently *assumed*, because of the absence of counsel at this critical stage, that the lineup was unfair and suggestive. It then proceeded to another question, the same as the second question involved in a Fifth Amendment inquiry, to wit, whether the prosecution could show an independent origin. If it could, then notwithstanding the Sixth Amendment violation, Wade's conviction would be reinstated.

Note that in each example, Fifth or Sixth Amendment violation, the trial court hearing is to determine whether the prosecution can show independent origin of identification. If a due process violation is alleged, then defendant must establish the suggestiveness before requiring the prosecution to overcome it. If a denial of counsel at a critical stage is alleged—and proved—then the suggestiveness is *assumed* and the prosecution is put to its proof of independent origin, because once the denial of counsel at a critical stage of the prosecution is established, the inability of defendant's counsel to prove suggestiveness is recognized.

### 2. *Wade applied to Ash*

What the Supreme Court recognized as true in *Wade*, where defendant's counsel was absent from a lineup, has been decisively refuted in *Ash*, where counsel was absent only from a display of photographs.[41] We are not forced to assume, because of counsel's inability to reconstruct the circumstances of the identification, as the Court did in *Wade*, that the identification procedure was suggestive, and thus remand for the trial court to explore independent origin. We already know, from defense counsel's able use at the trial of all the circumstances brought out in detail at the pretrial hearing, the full extent of any suggestiveness and the independent origin of the witnesses' identifications.

Co-defendant Bailey's counsel brought out and dwelt upon the witnesses' prior identifications—or lack of them—and

---

40. Clemons v. United States, 133 U.S.App. D.C. 27, 34, 408 F.2d 1230, 1237 (1968, *en banc*). See also Simmons v. United States, 390 U.S. 377, 383, 384, 88 S.Ct. 967, 19 L.Ed.2d 1247, upon which this court relied in determining the standard set forth in *Clemons*. 133 U.S.App.D.C. at 32–33, 408 F.2d 1235–1236.

41. See *supra*, Part I.B.

Bailey was acquitted. Ash's counsel had been forewarned by the pre-trial hearing, and could skip or dwell where he wished in the witnesses' recollection.

What makes *Wade* a Sixth Amendment right case—and why *Ash* is not—is that Wade was deprived of his counsel's presence at a time and place where it counted—the lineup. The lineup is truly a "critical stage" of the prosecution at which the Sixth Amendment requires counsel, as demonstrated by the handicaps under which Wade's counsel labored at trial. Not so with appellant Ash. He had no counsel present—neither was Ash—when the prosecuting attorney was displaying photographs to government witnesses in preparation for trial. But at trial his counsel was under no handicap in his defense, for two reasons: (1) the inherently different nature of a photographic identification from a lineup,[42] and (2) the full pretrial due process hearing at which defense counsel familiarized himself thoroughly with the preceding events and anticipated testimony.

What the Supreme Court directed to be done in *Wade* has already been done in *Ash*. Not only has it been done by the trial court, but, most important, both defendants' trial counsel utilized to the fullest extent at the trial the weaknesses in the four witnesses' identifications uncovered at the pre-trial hearing.[43] There was the fullest exploitation of the circumstances of the pre-trial photo identification and the pre-trial hearing —reflected in Part II of the majority opinion here. Ash's trial counsel was far from the situation described by the Supreme Court:

> . . . the predicament in which Wade's counsel found himself—realizing that possible unfairness at the lineup may be the sole means of attack upon the unequivocal courtroom identification, and having to probe in the dark in an attempt to discover and reveal unfairness, while bolstering the government witness' courtroom identification by bringing out and dwelling upon his prior identification.[44]

To prove the inappositeness of the *Wade* rationale and procedure to the case at bar, consider how altered the Supreme Court's opinion in *Wade* would necessarily have been if there had already been a trial court hearing on independent source, such as Judge Gasch conducted here, when the case reached the Supreme Court.[45] Even if the Supreme Court had desired to lay down a rule requiring defendant's counsel's presence at all lineups, it would not have vacated the conviction on the basis of any Sixth Amendment denial of right to counsel, because this would have already been rendered moot by the trial court hearing and could not have been decisive. Even in *Wade*, the Supreme Court recognized the ultimate undecisiveness of the Sixth Amendment violation by saying the District Court could reinstate the conviction, if the hearing showed an independent origin for the identifications.[46]

This is precisely what the Third Circuit did in *Zeiler II, supra*, note 19.

---

42. See text accompanying notes 7–8, *supra*.

43. See text following note 41, *supra*.

44. United States v. Wade, 388 U.S. 218, 240–241, 87 S.Ct. 1926, 1939, 18 L.Ed. 2d 1149.

45. Would the Court have dwelt at length on the Sixth Amendment right to counsel at the lineup and the handicaps defendant's counsel labored under at the trial because of his unfamiliarity with the strengths and weaknesses of the government identification evidence? I submit that it is clear the Court would not have written such an opinion. If there had been a trial court hearing at which defendant's counsel could have probed the circumstances of the lineup, and the trial court could have ruled on whether there was suggestiveness in the identification procedure and if so whether there was an independent origin, then the question of counsel's presence or absence at the lineup would have become decidedly subsidiary. The controlling issue would necessarily have been the adequacy of the trial court hearing on suggestiveness and independent origin.

46. 388 U.S. at 241–242, 87 S.Ct. 1926, 18 L.Ed.2d 1149.

Since the record of the trial resulting in two convictions "did not indicate what photographs were shown to the identifying witnesses in the absence of Zeiler's counsel," these two convictions were "remanded for a pretrial hearing in order to afford the Government an opportunity to prove 'by clear and convincing evidence' that its witnesses were not so influenced by the prior photographic confrontations as to be incompetent to make in-court identifications." [47] On remand the District Court ruled all witnesses who had been shown photographs outside the presence of defendant's attorney were incompetent to testify on retrial. The Third Circuit (in *Zeiler II*) reversed again, holding (1) the photographs and the procedure followed in exhibiting them were not unduly suggestive, and (2) the Government had brought out substantial evidence "that the in-court identifications at the first trial were of independent origin." [48].

Zeiler still has not had his counsel present at any prosecution exhibit of photographs to these witnesses, but when he is retried, all witnesses will be permitted to make an in-court identification. The applicability to *Ash* is, of course, that *Zeiler I* and *Zeiler II* hold that once the trial court makes a reviewable ruling on the question of suggestiveness and independent origin, the absence of counsel the majority here think is required by the Sixth Amendment is utterly immaterial.

What the Supreme Court found *undecisive* as to the ultimate result for *Wade* is likewise *undecisive* for *Ash*. And the trial court hearing, which the Supreme Court ordered in *Wade* and whose result *was* to be decisive for *Wade*, has already been had for *Ash*. *Zeiler II* confirms completely this analysis. The issues decisive of this case therefore turn on the content of that pre-trial hearing of Judge Gasch, *i. e.*, the presence of any suggestiveness in the photographic exhibition and the existence of an independent origin for the eyewitnesses' testimony.

If this analysis is correct, then Part III of Judge Leventhal's majority opinion, developing a Sixth Amendment rationale for reversal and extrapolating therefrom a rule for future police conduct, is beside the point. The relevant portion is Part II, dealing with Fifth Amendment questions of possible suggestivity and independent origin. Yet the majority specifically rejects this as the basis for its decision. "But we do not remand for this purpose [a more thorough hearing on impermissible suggestiveness] because there is another objection to the photographic identification that establishes the need for reversal. . . . We do not find it necessary to determine whether appellant's Fifth Amendment rights were violated because the color photographs were impermissibly suggestive. In the circumstances of this case, defendant's constitutional right to counsel at critical stages of the prosecution was violated. . . ." (Majority Opinion, at 98) So one thing is clear: the majority position stands or falls on the validity of its reasoning on the Sixth Amendment ground of a purported denial of counsel, *not* on the Fifth Amendment ground.

3. *The deterrence rationale of Wade on pre-trial identification is missing from Ash.*

We now come to the precise rule the majority seeks to promulgate in the case at bar:

We conclude that the sound rule prescribes that in general, subject to certain exceptions, *Wade* and its requirement of presence of counsel, are applicable to a Government exhibition of photographs of a person in custody for an offense to witnesses called to identify the person who committed the offense. (P. 100)

\* \* \* \* \* \*

We do not consider in this opinion whether or to what extent its principle should be applicable in case of a photographic showing subsequent to a lineup. (P. 104)

---

47. *Zeiler II*, 447 F.2d at 994.

48. *Id.*, at 996.

Whatever the merits of this rule in the abstract, no weaker vehicle could be found for its launching than the case of Ash.

Analysis of the rule, its foundation, and its logical applicability to the situation here, with respect to both pre-trial and in-trial identifications, shows why.

The action of the majority is unsupported by the rationale of *Wade* in regard to *pre-trial* photographic (or lineup) identifications. The Court's (Justice Brennan's) opinion in *Wade* implied that the deterrent effect of the exclusionary rule would be the rationale for barring testimony of pre-trial identifications at which defendant's counsel had not been present.[49] This the Court made explicit in Gilbert v. California:

> Only a *per se* exclusionary rule as to such testimony [that they identified Gilbert at the lineup] can be an effective sanction to assure that law enforcement authorities will respect the accused's constitutional right to the presence of his counsel at the initial lineup. *In the absence of legislative regulations adequate to avoid the hazards to a fair trial* which inhere in lineups as presently conducted, the desirability of deterring the constitutionally objectionable practice must prevail over the undesirability of excluding relevant evidence.[50]

As the majority opinion itself states, the District of Columbia police have sub-

sequently promulgated rules requiring every defendant to be placed in a lineup with his counsel present immediately after arrest—in some cases *before* arrest —for identification. To reverse Ash's conviction because of, or to bar the use of, the pre-trial photo identifications on the Sixth Amendment ground of counsel not being present would be to apply a *per se* exclusionary rule *where it could not possibly have a deterrent effect*. As *Gilbert* made clear, it is only "[i]n the absence of legislative regulations [when] . . . the desirability of deterring . . . must prevail over the undesirability of excluding relevant evidence."[51] We now have the "legislative regulations adequate to avoid the hazards to a fair trial." As of December 1971, since the Metropolitan Police Department drew up uniform procedures for conducting police lineups, there has not been a single case dismissed for improper or suggestive lineup identification.[52] The police rules themselves thus prohibit a repetition of the peculiar circumstances of this case. Should such circumstances again occur, then it will be logical to apply such a *per se* exclusionary rule.

4. *The rationale of Wade on in-court identification is likewise missing from Ash.*

It is even more certain that the Sixth Amendment right to counsel in May 1968 has no relevance whatsoever to the *in-court* identifications by the witnesses

49. "Where, as here, the admissibility of evidence of the lineup identification itself is not involved, a *per se* rule of exclusion of courtroom identification would be unjustified. See Nardone v. United States, 308 U.S. 338, 341 [60 S.Ct. 266, 84 L.Ed. 307]." 388 U.S. at 240, 87 S.Ct. at 1939, 18 L.Ed.2d 1149. The Court added, in a footnote, "We reach a contrary conclusion in Gilbert v. California [388 U.S. 263, 87 S.Ct. 1951, 18 L.Ed.2d 1178] as to the admissibility of the witness' testimony that he also identified the accused at the lineup." 388 U.S. at 240n, 32, 87 S.Ct. at 1939.

50. 388 U.S. 263, 273, 87 S.Ct. 1951, 1957, 18 L.Ed.2d 1178 (emphasis supplied). The rationale of the exclusionary rule is thus its purported deterrent effect, which has no applicability to the facts of *Ash*.

Ash was arrested in early 1966, *Wade* was decided a year and a half later, the police were not on notice until then that the most approved technique would be to put Ash in a lineup with his counsel present. The photographic display to the witnesses the day before and on the day of trial in May 1968 was not intended to be the equivalent of a lineup (it was merely part of the prosecutor's pre-trial preparation), and neither *Wade, Gilbert,* nor any subsequent case had held that the *Wade* rationale for right to counsel applied to photographic identification.

51. 388 U.S. at 273, 87 S.Ct. at 1957.

52. M. E. Pitts (Deputy Chief, Metropolitan Police Department, Washington, D.C.), "How Sound Is Your Police Lineup," FBI Law Enforcement Bulletin (December 1971).

on *re*trial of this case, which necessarily will be almost four years after the photographic identifications complained of. As emphasized above, Judge Leventhal's opinion makes clear that the ground of reversal here is a Sixth Amendment right of which the defendant was deprived,[53] so what relevance does the presence or absence of defendant's counsel at the photographic identification in May 1968 have to the witnesses' possible identification of the accused in court in early 1972?

Again the majority opinion is contrary to the Sixth Amendment rationale of *Wade*. There the Supreme Court pointed out that an exclusionary rule which concerned only the lineup evidence "without regard to admissibility of the courtroom identification, would render the right to counsel an empty one." [54] The Court stressed that "counsel's presence at the lineup would equip him to attack not only the lineup identification but the courtroom identification as well," since "[t]he lineup is most often used, as in the present case, to crystallize the witnesses' identification of the defendant for further reference." [55] The crystallized identification might then carry over to taint the witness' identification at trial.

The remedy for this, said the Court, is to permit the defense to attack the proffered in-court identification, but *not* to invoke any *per se* exclusionary rule which might be justified in regard to a pre-trial identification which was either unfair or from which defendant's counsel had been absent. Rather, the Government should have an opportunity to show that its identifications have " 'been come at . . . by means sufficiently distinguishable to be purged of the primary taint' ",[56] *i. e.*, the familiar "independent origin."

So in *Wade* the case was remanded for such determination *because* " . . . whether the in-court identifications had

an independent origin . . . was not an issue at trial." [57] Depending on the outcome of the hearing on independent source, the District Court was "to reinstate the conviction or order a new trial, as may be proper." [58] In the case of Ash the District Court *has already held this hearing and determined independent origin,* after both defense counsel had been given every opportunity to attack the proffered in-court identification.

II. *Due Process Under the Fifth Amendment*

A. *The Evidence and Its Development*

In Simmons v. United States the Supreme Court, speaking unanimously on this point, laid down the standard for resolving questions arising from initial identification by photograph in these terms:

Despite the hazards of initial identification by photograph, this procedure has been used widely and effectively in criminal law enforcement, from the standpoint both of apprehending offenders and of sparing innocent suspects the ignominy of arrest by allowing eyewitnesses to exonerate them through scrutiny of photographs. The danger that use of the technique may result in convictions based on misidentification may be substantially lessened by a course of cross-examination at trial which exposes to the jury the method's potential for error. *We are unwilling to prohibit its employment, either in the exercise of our supervisory power or, still less, as a matter of constitutional requirement. Instead, we hold that each case must be considered on its own facts,* and that convictions based on eyewitness identification at trial following a pretrial identification by photograph will be set aside on that ground *only* if the photographic identification procedure was so impermissibly suggestive

---

53. Majority Opinion, Part III.

54. 388 U.S. at 240, 87 S.Ct. at 1939.

55. *Ibid.*

56. 388 U.S. at 241, 87 S.Ct. at 1939.

57. 388 U.S. at 242, 87 S.Ct. at 1940.

58. *Ibid.*

as to give rise to a very substantial likelihood of irreparable misidentification. [Emphasis supplied.][59]

Both at the pre-trial hearing, at which the trial judge ruled that the witnesses could make in-court identifications,[60] and at the trial itself the four eyewit-

59. 390 U.S. 377, 384, 88 S.Ct. 967, 971, 19 L.Ed.2d 1247 (1968).

60. From reading the opinion of the majority one might be left with the impression that only *one* of the eyewitnesses testified at the pre-trial hearing. See Majority Opinion, at 96. Perhaps this partially explains my difference with the majority as to the foundation for the independent source determination, since I am taking into account *both* of the witnesses who testified at that hearing, Mrs. Paugh and Mrs. Apple (See Transcript, pp. 88–102, for the testimony of Mrs. Paugh; and Transcript, pp. 122–134 for the testimony —at the hearing—of Mrs. Apple). As I will elaborate *infra*, I conclude that there was quite sufficient support for the finding of independent source, not the smallest part of which was the testimony of the *two* eyewitnesses.

61. A. Mrs. Paugh, one of the tellers, testified at trial:
Q. . . . Just look around and tell us if that man is here?
A. I cannot be sure if he is here.
Q. Can you identify that man who walked in the bank, the man you described?
A. Not definitely.
* * * * *
Q. Mrs. Paugh, the question was, I want you to look around the Courtroom and tell us whether or not you can make any kind of identification of the man who waved the gun around in the bank?
A. I can make no definite identification.
Q. You stated that.
A. Other than the fact there is a young man that is here that looks similar to the one in the lobby.
Q. Would you kindly point out that person?
A. This young man right here at the end of the table (indicating Ash).
* * * * *
Q. . . . I am sorry, did you give your best estimate of the time of this robbery, from the time you first noticed that person?
A. I would say approximately three minutes.
Q. During that three minutes, what were you doing?

nesses testified frankly that they were not certain of their identifications of the accused. In light of the Supreme Court standard the exact degree of identification established by each witness is of considerable importance, hence it is set forth in pertinent detail below.[61] The

A. I was sitting there petrified.
* * * * *
Q. What portion of those three minutes, after you first noticed the gentleman you mentioned, after you first noticed him, what portion of any of those three minutes did you look at him?
A. Well, I would say constantly, because I didn't took at the young man on the right who was taking the money.
At the pre-trial hearing, Mrs. Paugh had testified:
Q. Now, did these—isn't it a fact these photographs that you saw yesterday recreated in your mind the impression that you had or created in your mind an appearance of the person you might have seen at the time of the offense?
A. No, not really. They were a collection of photos like the first ones, some were short and tall and varying in sizes. I mean, they didn't leave me with an impression on me, really.
* * * * *
Q. Did these photographs in any way refresh your recollection or recreate in your mind an image of the person or a person that you saw or might have seen at the time of the offense?
A. No, sir, they did not.
B. The other teller, Mrs. Major, testified at trial:
Q. . . . From the time you first noticed that first man, the man with the gun, until the two men left the bank, what portion, if any, of that time did you look at that first man?
A. Most all the time.
Q. Now, I want you to look around the Courtroom, Mrs. Major, and tell us whether or not that man that you described is or is not present in this Courtroom?
A. I believe he is.
Q. Would you kindly state who it is?
A. It is this gentleman, the first one (indicating Ash).
* * * * *
Q. All right. Are you prepared to tell us with absolute certainty that is the same man, the man you saw in the bank that day is the same man you pointed out today?
A. I cannot say with absolute certainty, no.

Q. You have some doubt in your mind?

A. I have no doubt in my mind, but I cannot say with absolute certainty.

She was not called for the pre-trial hearing. C. The depositor, Mr. Taylor, testified at trial:

A. I was talking to Mr. Burton who is one of the tellers and in the course of our conversation, the door opened, I glanced to my left and saw a man come in and then we resumed our conversation.

Momentarily, thereafter, he, the man, said, "Don't move, this is a holdup."

A. The gentleman moved around in the bank and—he left out and appeared to drop a bullet, I heard an object fall on the floor, and I saw him reach down, just out of the corner of my eye.

\* \* \* \* \*

Q. For how long a period of time did you look at this person?

A. Just a matter of seconds.

\* \* \* \* \*

Q. And in terms of inches or feet, how far away were you from him?

A. Very close. I guess about maybe from—about that distance (indicating).

Q. All right. Would you look around the Courtroom, Mr. Taylor, and tell us whether or not the person you described is present in this Courtroom?

A. The first man on the end looks sort of like the man that I saw coming in (Ash).

\* \* \* \* \*

Q. All right. When you turned as you described, as you looked at the man, did you see his full face?

A. When was that? You mean when he first came in?

Q. First off, when he first came in?

A. When he first came in, yes.

Q. You were able to make out his full features?

A. Not fully. That is the reason I said he looks like—I was not certain.

Q. All right. Did he have a mask on?

A. Not when I saw him.

\* \* \* \* \*

Q. Are you prepared to tell us with absolute certainty the man you pointed out is the same man who was in the bank that morning?

A. No, I cannot.

Q. You just said that—

A. I said it looks like him.

Q. You have some reservations?

A. I cannot be certain that he is.

He was not called at the pre-trial hearing.

D. Mrs. Apple, the witness sitting in the car outside, testified at the pre-trial hearing:

Q. What was told to you by the officers at the time, the officer or Agent Markowvich of the FBI at the time these photographs were shown to you? Was anything said about the photographs that were shown to you?

A. No.

Q. What did you believe them to be?

A. Well, I said that I thought that was the two men, I wasn't sure.

At the trial after identifying the two defendants before the jury, she testified on cross-examination:

Q. You were facing south. You say you saw the first man carrying a bag when he came around the corner, is that correct?

A. Yes.

Q. Also you didn't know there was a robbery?

A. At the first moment, I didn't know.

Q. All right. You only got a fleeting glimpse of that person, isn't that so?

A. That is right.

Q. Now, also at that time you didn't know there was a robbery, is that correct.

A. That is right.

\* \* \* \* \*

Q. Now, as the second man ran up 9th Street, which direction did he go?

A. He went through the alley way, too.

Q. As he ran past you, you did not see his full face?

A. No.

\* \* \* \* \*

Q. On either occasion, as these two people ran past you, you did not see their full face?

A. Yes.

Q. And you only saw at the most was a profile?

A. Yes.

Q. The right side of their face?

A. Yes.

Q. All right. Were there any distinguishing marks you might have seen on their face, a scar or a mustache or glasses or anything like that?

A. No.

Q. Then the identificaion you made of those two individuals is only the profile, isn't that so?

A. That is right.

\* \* \* \* \*

Q. And your memory has dimmed since that time?

A. Yes, it has.

witness who had been outside in the automobile and had the opportunity to see both men fleeing without a mask on was the most firm in her identification. Neither of the four witnesses was questioned by the prosecutor concerning the previous photographic identifications of the appellant, although counsel for defendant Bailey brought out from one witness that she had been unable the day before to identify Bailey's picture in the group of five. After colloquy at the bench, all parties, including appellant's own trial counsel, then stipulated all five color photographs could be received in evidence for the jury.

I am unable to agree with the conclusion of the majority that "[t]here was prejudicial error at the trial when the prosecutor insisted that the jury see the color photograph of Ash, entrenching that pre-trial identification, and notwithstanding the objection of counsel for Ash pointing out the prejudice to Ash the trial court ruled it would be received in evidence." Majority Opinion, at 105. This is because I do not believe the majority draws the correct inference from the events at the trial in making their assertions in footnote 6 that "The threshold objection of Ash's counsel was not waived . . . by his accession— in the face of the court's ruling—to a procedure whereby (a) all five photographs would be admitted . . . and (b) be admitted by stipulation—to resolve a squabble whether the photographs, already held admissible, should be offered by Bailey's counsel or the prosecutor."

In order to point up what I believe to be the majority's error here it is necessary for a rather detailed review of this part of the trial, which the majority discusses at 96ff.

The controversy with which we are concerned was related to the showing of the color photographs to Mrs. Apple by

Agent Hugh Berry at the Savarin Restaurant in Union Station on 7 May 1968 (see Transcript, pp. 45–46, Pre-Trial Hearing of 8 May 1968). At the trial in response to questioning by Bailey's attorney, Agent Berry testified that Mrs. Apple identified one of the color pictures (then marked as Defendant's Exhibit No. 5 for Identification) "as the man who was engaged in the holdup" of the bank. (Transcript, p. 411.) This was the photograph of Ash. Bailey's attorney then showed Agent Berry Defendant's Exhibit No. 4 for Identification, which was the picture of Bailey, and established that Mrs. Apple made no identification of that picture. Bailey's attorney then offered Defendant's Exhibit No. 4 (the Bailey picture) into evidence. Ash's counsel then stated that he had no objection to *that* picture coming into evidence. (Transcript, p. 412.) After this offer by Bailey's attorney, but before the court had a chance to rule, the prosecutor stated that he thought the Ash picture (Defendant's Exhibit No. 5) should also go into evidence, and Ash's counsel noted that he would object to that.

Observe that at this point only *one* picture is being offered in evidence, Bailey's, by his own attorney, and it has been suggested that *only a second picture,* Ash's be introduced. While no formal offer was made by the prosecutor, Ash's counsel has informed the court he would object to the second picture. Observe that what Ash's counsel has said he would object to is a situation in which *only two pictures,* those of Bailey and Ash, will be put into evidence.

At that point all counsel went to the bench, and the prosecutor stated that he thought all five of the color photographs should go into evidence. Bailey's attorney then apparently withdrew his motion to admit Exhibit No. 4 (Bailey's photograph). (Transcript, p. 413.) Fol-

---

Q. Are you prepared to tell us with absolute certainty the two people who ran past you and you saw their profile are the same two people here?

A. I still say so.
Q. There is no question in your mind?
A. No, there isn't.

lowing this, the proceedings at the bench are quite difficult to follow, but soon after, Bailey's attorney is again trying to offer something into evidence, and it appears to be the photograph of Ash that Mrs. Apple identified (Defendant's Exhibit No. 5). (Transcript, p. 416.) To this offer Ash's counsel stated, "I would oppose it." (Transcript, p. 416.) At this point what is being offered is still only one photograph, of Ash, this time by Bailey's attorney. The court, who had not ruled on this latest offer of Bailey's attorney, then suggested, "Should we introduce all five?" (Transcript, p. 417.) *To this suggestion by the court, Ash's counsel replied, "That might avoid prejudice against Ash."* (Transcript, p. 417.)

Next, back in open court, the prosecutor stated, "Your Honor, *it has been stipulated* that Defendant's Exhibits 1 through 5 are in fact the five photographs shown by Agent Berry to Mrs. Apple, *and it is further stipulated they may be introduced into evidence.*" (Transcript, pp. 417–419.) Bailey's attorney said, "That is so stipulated." And Ash's counsel then plainly and unqualifiedly stated, *"So stipulated."* (Transcript, p. 418.) The court then concludes, "They may be received in evidence," and the photographs were duly received. (Transcript, p. 418.)

Thus what Ash's counsel objected to (and it should be noted that he never really gets as far as making an objection, because no one actually offered Bailey's Exhibit No. 5—the photograph of Ash—into evidence in open court is the offer of Ash's picture, alone or coupled only with Bailey's, and thus unquestionably identified as the picture that Mrs. Apple picked out as one of the holdup men. This offer was never made in open court, and indeed the only offer made in this entire controversy (Transcript, pp. 411–418) which was ruled on and accepted by the court was the offer made by the prosecutor (Transcript, pp. 417–418), to admit all five pictures. This is the stipulation, to which no one objected.

Thus it can be seen that the suggestion of the majority that Ash's counsel made an objection which was not waived by the stipulation is inaccurate. As demonstrated above, Ash's counsel *never actually got as far as making an objection,* and whatever qualms he did express *were made before, and not after, the Government's offer of the five pictures.* Most important, this embryonic objection was directed to a situation in which Ash's picture would be offered either alone or as a pair with Bailey, and positively identified by the witness Apple as being the holdup man in contrast to that of Bailey which she did not identify. Understandably, Ash's counsel would object to this, but also understandably, he *did not object to all five* photos coming in, because *Bailey could not be denied his right* to show that the eyewitness, while capable of identifying another, had not identified him. The method chosen, admission of all five photos, carried the least possible prejudice to Ash, and therefore his counsel did *not* object.

The majority opinion holds that the admission of these five photographs was prejudicial to Ash, finally in "IV. Conclusion and Remand Order" saying "There was prejudicial error at the trial when . . . notwithstanding the objection of counsel for Ash . . . the trial court ruled it [Ash's photograph] would be received in evidence" (at 105). The majority opinion thus rests on a major factual error—there was *never* an objection, explicit or implicit, by Ash's counsel, to the admission of *all five* photographs—and a completely untenable legal premise, for both Bailey's attorney and the prosecutor were entitled to have the five photos in evidence, the first to show the eyewitness' failure to identify Bailey, the second to show (later) the same eyewitness' identification of Ash.

The tellers both testified that they could not make out the features of the gunman's face because of his mask; the depositor did have a look at the gunman

(allegedly the appellant) when he first entered the bank, apparently before he · donned his stocking mask; the lady in the car outside saw appellant only as he was running past her car. Thus the identification as to facial characteristics was weak at the time, but the description as to height, weight, and general build was proved accurate.

Although Judge Leventhal states that the first identifications in February 1966 were by "a showing of facial mug shots to witnesses who had not given a description in terms of facial characteristics," [62] yet this does not mean that the four eyewitnesses would find it impossible to identify the appellant in the first group of pictures (the black and whites) submitted to them. All four of them *did* pick out appellant's picture, although only one was able to identify very tentatively his codefendant. This would seem to indicate that the witnesses retained a sufficient impression of the facial and other related characteristics of the gunman to identify him, although each expressed an honest uncertainty. One explanation of at least the two tellers' ability to pick out Ash's photo and to identify him at trial, where of course they saw the whole man, is revealed in one teller's testimony:

Q. You couldn't make out his face, is that correct?

A. That is correct.

Q. Was there anything distinctive about his appearance, his height, his weight, his build?

A. Yes, I noticed several things at the time. I noticed that he was a light-skinned negro, I noticed he was about six feet or in that neighborhood, I noticed that he was slender. I noticed he was very neatly dressed. *These things we are trained to notice in the event, notice all the little details,* *and we wrote them down immediately following the robbery.* (Emphasis supplied.)

In all the record of this case—with black and white photos, with colored photos, and in person in the courtroom—there was never an identification of any other person in the group of photos as being in the robbery, not even of appellant's codefendant, except by the witness in the car outside, who declined to make a firm identification until she had seen Bailey in the flesh.

### B. *The Alleged Taint of In-Court Identification of Ash by Pre-Trial Identification of His Pictures*

In two decisive ways the majority opinion fails to come squarely to grips with the test of *Simmons, supra,* and our own *en banc*-prescribed procedure in Clemons v. United States.[63]

### 1.

First, the Supreme Court in *Simmons* placed the burden on appellant to establish a Fifth Amendment violation: "Convictions based on eyewitness identification at trial following a pretrial identification by photograph *will be set aside on that ground only if* the photographic identification procedure was *so impermissibly suggestive* as to give rise to a *very substantial likelihood* of *irreparable* misidentification." (Emphasis supplied.)[64]

On this critical preliminary test, the majority vacillates. It finds "elements of suggestiveness . . . strong enough so that it cannot be assumed that there was no undue suggestiveness," [65] but it also recognizes "indications offsetting in part the inference of undue suggestiveness." [66] Judge Leventhal then immediately turns to the rationale: "The identifications at trial were weak, and in fact no stronger than those given two

---

62. Majority Opinion, at 98.

63. 133 U.S.App.D.C. 27, 408 F.2d 1230 (1968).

64. Simmons v United States, 390 U.S. 377, 384, 88 S.Ct. 967, 971, 19 L.Ed.2d 1247 (1968).

65. Majority Opinion, at 98.

66. Majority Opinion, at 98.

years before on the basis of the mug-shots." [67]

As to the five color photographs shown to three witnesses the day before trial and to one witness on the morning of trial, only three of the four eyewitnesses could identify Ash in these photographs and no one could identify Bailey. Again, if these photographs were suggestive, it is strange that they were suggestive only as to Ash for three witnesses, and for the fourth suggested nothing—although on the same day he did identify Ash at trial.

In contrast to the three factors listed by Judge Leventhal, there is a factor suggestive as to one of the other three persons. There were three photographs of this person, full-face and right and left profiles; of Ash and Bailey there was only a full-face each.

We must assume that the photographs of Ash and Bailey are reasonably good likenesses; if not, either the trial judge at the pre-trial hearing or counsel for the prosecution or one of the defendants would surely have pointed this out.

The question of course is what influence viewing these pictures had on identification at the trial. While the majority lists three factors that might appear suggestive as to the identification of Ash when the witnesses were picking out his photograph, these same factors would lead the witnesses to pick out Bailey, if these factors were truly suggestive. None of the four identified Bailey. Furthermore, one of the four witnesses who did identify Ash at trial was unable to pick him out from the photograph, even though it was full-length.

As to why Bailey was not identified in these pictures by anyone, there are two possible explanations: (1) Bailey actually did not participate in the bank robbery; or (2) all of the witnesses had less opportunity to see Bailey in his alleged role of scooping up the money behind the tellers than they did to see the gunman (allegedly Ash) who was in the bank longer and attracted more attention.

Either of these reasons points to the authenticity of the witnesses' identification of Ash in the photographs and at trial and likewise negates any inference that the photos themselves were suggestive or in any way contributed to the identification of Ash at trial.

Considering all of the above, I can only conclude that the photographs were not suggestive as to Ash, at least to the extent of having any effect whatsoever on the eye-witnesses' in-court identification of Ash and their in-court failure (with the exception of the witness outside in the car) to identify Bailey at all.

At trial the four eyewitnesses stated that their in-court identification of appellant Ash was based upon their opportunity to observe at the time of the bank robbery, and each gave the details as to his or her opportunity to observe. Most significantly, each witness emphasized that his or her identification of appellant was *not* certain and conclusive. As shown by the language quoted in footnote 61, *supra*, each witness' identification was highly qualified, even that of Mrs. Apple (in the car outside) who finally wound up saying that she was "certain," but prior thereto had given ample evidence of her uncertainty.

As stated above, the key to the majority's position on the Fifth Amendment ground is suggestivity in the photographs. Where the issue is suggestivity and taint of the in-court identification, the key question is not whether the in-court identification is strong or weak, as Judge Leventhal emphasizes. The key question is whether the in-court identification is *consistent with* the pre-trial identification and the opportunity the eyewitnesses had to see the appellant at the scene of the crime. I think that the testimony of the eyewitnesses in court identifying appellant Ash was consistent with the opportunity that these eyewitnesses individually had to observe Ash at the scene of the crime, as shown by their testimony quoted in footnote 61, *supra*. The language of the witnesses' in-court

67. *Ibid.*

identification is, in fact, also consistent with the degree of certainty manifested by each witness in identifying appellant Ash from the original set of five black and white photographs shown a little over five months after the crime.[68]

Precisely because the original black and white photographic identification of Ash by each of the four witnesses, only five months after the crime and before Ash was arrested, *was* consistent with the degree of certainty of both the in-court identification and the colored photograph identification, it is of some legal importance. Since *Wade* is not retroactive,[69] it cannot be maintained that there was any constitutional requirement of counsel at the February 1966 photographic lineup. Thus, it can be said of these identifications that " . . . each of the eyewitnesses testifying at trial had already made identifications at a valid showup or lineup prior to viewing the [color] photographs. These eyewitnesses had established their ability [whatever it was—strong or weak] to identify the suspects; the viewing of the photographs merely served to refresh their memories

of the men they had previously chosen"[70] —as this court said in United States v. Hines and Ware, decided 1 November 1971.

In *Hines and Ware* the prosecutor was doing exactly what Ash's prosecutor did, show the accused in a group of photographs to each witness on the eve of trial, in order to make sure the witness' recollection was still *the same as in the previous identification.* In neither *Ash* nor in *Hines and Ware* was there an attempt to secure an *original identification;* rather, *that had already been done under circumstances permissible at the time the original identification* was made.[71] In fact, in *Ash* one witness (the depositor, Taylor) did *not* identify Ash from the colored photographs on the eve of trial, although he had done so from the black and white photographs before Ash was arrested and did so in the courtroom at the trial itself.

I recognize, of course, that the court's opinion in *Hines and Ware* states, "Where, as here, positive identifications have already been made, the point at

---

68. Agent Markowvich testified that the four witnesses to whom he showed the black and white photos on 3 February 1966 "were not positive in the identification at that time."

69. Stovall v. Denno, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967).

70. United States v. Hines and Ware, 147 U.S.App.D.C. 249, at 263, 455 F.2d 1317 at 1331 (Nos. 23,281 & 23,291).

71. The original identification of Ash by all four witnesses never came before the jury at trial. These identifications, made before Ash was arrested, were *properly* brought out in the pre-trial hearing, and thus formed part of the basis on which the trial court clearly ruled the witnesses had an independent origin for their in-court identifications. There was no hint of suggestivity in the photos themselves or in the manner of presentation, done by two FBI Special Agents, not the police. The fact that the prosecution, 18 months before *Wade* was decided, did not preserve these identical photos for later comparison, should not prevent the trial court and ourselves from considering the identifications then made as a basis for a finding of independent origin. (The identical pho-

tos of Ash and Bailey *were* preserved, and the names of the other three persons, enabling photos of them to be presented to the trial court.)

It must be kept in mind that the prosecution never intended to make previous photographic identification a part of its case. The previous identification of Ash in the color photographs came out as a prosecution response to the proof *by Bailey's attorney* that no one had identified Bailey in the colored photographs, evidence for Bailey which had to be admitted, and the whole story of the witnesses' *identification* of Ash—including Taylor's *failure* to identify him—then came in by stipulation. For a detailed description of the trial proceedings that resulted in this stipulation, see text following note 61, *supra.* The prosecution never displayed the colored photographs to the witnesses for the purpose of using the resulting identifications in court, these displays were simply pre-trial review as in *Hines* and *Ware, supra* note 70, but given the turn of events at trial and the previous black and white photo identifications two years earlier, the prosecution was entitled to offer the colored photo identifications.

which the witnesses merely review their prior identifications cannot normally be considered a critical stage for Sixth Amendment purposes. Such review by means of photographs does not taint an in-court identification, but may affect its weight if the defense chooses to develop the matter by cross-examination." [72] I also recognize that the previous identifications in *Hines and Ware* were "positive," and although "all four witnesses selected the [black and white] photograph of appellant [Ash] as the gunman," that "they were not positive in the identification." [73] The identifications in *Hines and Ware* were positive throughout, while the testimony of all four witnesses in *Ash,* whether of the black and white photographs, color photographs, or in-court identifications, revealed the same honest qualifications as to certainty. Yet these four were eyewitnesses, and honestly expressed uncertainties have always been for the jury to weigh. These uncertainties have not, and should not, cause the testimony to be barred completely on the standard of *Simmons,* which requires "procedure . . . so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification."

In cases involving different circumstances, it is true that a *strong* in-court identification of the accused, based on an opportunity for a clear identification at the scene of the crime, would show an independence of any taint derived from viewing photographs of the accused between the time of the crime and the time of trial. In a converse factual situation, as we have here, the *weak* trial identification of all the witnesses, completely consistent with their weak identification of the accused by the initial set of photographs, likewise shows the independence and freedom from taint of their recollection at the time of their in-court identification. The majority opinion frankly states, "The identifications at

trial were weak, and in fact no stronger than those given two years before on the basis of the mug shots." [74]

Where suggestively in the pre-trial identification procedures is charged as here, the key question is *independence* of the in-court identification, the *consistency with* the pre-trial identification, the *absence of a taint* derived from previous photo identification—not whether the trial identification is strong or weak—which determines under the standard of *Simmons* whether the in-court identification can be achieved in evidence.

### 2.

This brings us to the second of the two decisive ways in which the majority opinion fails to grapple with the problem according to established standards, this time by our own court *en banc.*

The majority opinion apparently relies on two bases here: (1) that the colored photographs were suggestive, and (2) that the District Court's finding of independent source cannot be sustained. Both, I submit, are wrong on the legal standard as applied to the facts here. The first, even if true, could not be decisive on the Fifth Amendment issue; the opinion's reasoning rests the second conclusion on the first; and, in reaching the second conclusion, the opinion contradicts our *en banc* decision in *Clemons, supra.*

The opinion at two places takes pains to point out that the trial court did not expressly say that the photographic presentation was not suggestive,[75] and in each instance the opinion draws the inference that "[I]f anything [the] independent source determination rested on an assumption of undue suggestiveness." [76] Yet no finding of suggestivity being present could be decisive on the Fifth Amendment issue (although a finding of no suggestivity could be), such finding merely places the burden on the

---

72. Hines and Ware, *supra* note 70, at 127, at 1331 of 455 F.2d.

73. Majority Opinion, at 95, 105.

74. *Ibid,* at 98.

75. *Ibid,* at 96, fn. 5, and at 98.

76. *Id.,* at 98.

prosecution to establish an "independent origin," as the Supreme Court clearly laid down in *Wade, supra,* and as the majority opinion apparently recognizes here.[77] Of great importance, the District Court did make an unmistakable finding on the decisive issue, "the Government has established a basis for an in-court identification by clear and convincing evidence."[78] In Clemons v. United States, *supra,* this court *en banc* unqualifiedly recognized the decisive nature of such a finding by the trial court:

> The Supreme Court has, as noted above, expressly contemplated that in-court identifications may be found capable of standing on their own feet, even though preceded by deficient pre-trial confrontations. It has also emphasized the key role which the trial court, because of its direct exposure to the witnesses, plays in any such determination.[79]

Instead of resting his "'independent source" determination "on an assumption of undue suggestiveness," the District Judge was doing no more than we told him to do in *Clemons.* There we exhorted the trial judges to make this finding of independent origin, even though the pre-trial identification had been found non-suggestive, because if on appeal this first finding were held erroneous, a remand would be avoided if the District Court had already made its finding of independent source for the in-court identifications.[80] Hence, even if the majority here made a finding on this appeal of suggestivity, Ash's conviction should not be reversed.

Ash falls squarely within the rule of *Clemons* and *Wade.* Whether Judge Gasch made a finding on suggestivity or not (clearly, the majority think he did not), he unquestionably made a clear finding of independent source for the Government's in-court identification, as recognized by the majority opinion. On the tests of *Simmons* and *Clemons,* and with reference to the action taken by the Court in *Wade,* Ash's conviction must be affirmed.

One more consideration needs to be stressed in regard to the weight to be given Judge Gasch's decisive finding in the District Court. Unless this Court of Appeals is resolved to try these identification cases *ab initio* on a cold record, we owe some weight to the trial judge's findings. We are admonished by the Supreme Court to do so, we gave recognition to that in *Clemons, supra,* and in concurring in *Clemons* Judge Leventhal himself, with whom joined Judge (now Chief Justice) Burger, pertinently remarked:

> . . . these matters are properly to be resolved by the trial judge, at least in the first instance, and . . . appellate resolution marks the rare exception.[81]

I am impressed by the careful pre-trial hearing conducted by the District Judge here. We should weigh his opportunity to see and hear the witnesses in person, and to see not only the photographs but the defendants. We should not be disposed to upset his determination that the witnesses could make an in-trial identification untainted by their previous photographic identifications, and therefore that to permit such would not violate any due process rights of the appellant.

The majority has apparently attempted to brush aside the trial court's explicit finding of independent source merely because a lineup was not held, and to support this the majority cites our recent cases of (Anthony) Long v. United States[82] and United States v. Gambrill.[83] With regard to *Long,* I believe that the

77. *Id.,* at 98, and p. 105, fn. 20.

78. *Transcript* (of Hearing), at 103.

79. 133 U.S.App.D.C. at 38, 408 F.2d at 1241.

80. See 133 U.S.App.D.C. at 34, 42, 408 F.2d at 1237, 1245.

81. 133 U.S.App.D.C. at 49, 408 F.2d at 1252.

82. 137 U.S.App.D.C. 311, 424 F.2d 799 (1969).

83. 146 U.S.App.D.C. 72, 449 F.2d 1148 (1971).

trial judge here was satisfied that the independent source met the test specified in *Long:* "that prior to the tainted confrontation the witness was capable of making a spontaneous identification of the suspect based upon his observations at the time of the offense." [84] On the facts as they have been presented to us, the finding that the eyewitnesses who identified Ash did so as a result of observation of him at the time of the crime meets any requirements specified by *Long.*

As for *Gambrill,* there the court did say "our own view of the entire record may impel us to conclude that the evidence concerning the existence of an independent source is insufficient to satisfy the burden which rests upon the Government," [85] but in view of the great differences between this case and *Gambrill* I do not think that holding has any bearing here. In *Gambrill* there was only one identification witness, an understandably excited rape victim, and her observations (the "independent source") were made in a dimly-lit area, outdoors at night, and were of assailants who wore handkerchief-type masks during a substantial part of the encounter. Here we have four identification witnesses, each with his own "independent source" of observations made during the midmorning in a brightly-lit bank or outside, and two of the four witnesses had an opportunity, albeit fleeting, of observing the defendant when he was unmasked. The *Gambrill* case and this case are not comparable; indeed, I think the difference here is between night and day.

Given the far greater evidence of independent source that we have here, I would uphold the trial judge's finding of "clear and convincing" evidence of independent source. It is significant that *Gambrill* cited no other case reversing the holding of the trial judge on the question of independent origin, as we noted in United States v. Johnson and Estes.[86] *Zeiler II* is the only other case

which has come to my attention, and there the Third Circuit reversed to say that the evidence of independent origin *was* quite sufficient to justify in-court identification.

The lesson from all the cases, beginning with *Wade,* continuing with *Simmons* and all our own decisions, including *Clemons en banc,* is that the trial judge's decision on independent origin, being a question he is peculiarly well equipped to decide, should stand, with only a "rare exception." (Even the reversal of the trial court which we make today in *Brown and Proctor* is no exception, for there the trial court made implicit findings of independent origin, but erroneously let the absence of counsel bar the identification testimony.)

Whatever uncertainties or weaknesses existed in the four eyewitnesses' testimony, they were fully exploited by both defendants' counsel, and were glaringly apparent to the jury—which convicted Ash but not codefendant Bailey.

In considering the admissibility of identification evidence at trial, constitutional infirmities will bar its admission, but testimonial infirmities go only to the weight of the evidence. We start with the principle, well phrased by Judge (now Chief Justice) Burger in a different context but thoroughly applicable here: "When an eyewitness is willing to give testimony, under oath and subject to all the rigors of cross-examination and penalties of perjury, he must be heard." [87]

The testimony of the four eyewitnesses here was not tainted by their previous examination of and identification of appellant Ash by the photographs. Nor was there any "critical stage" at which the right to counsel was denied. The witnesses' testimony was shown to be wholly their own testimony, whatever its strength, and they were properly heard.

I would affirm the conviction.

84. 137 U.S.App.D.C. at 315, 424 F.2d at 803.

85. 146 U.S.App.D.C. at 81, 449 F.2d at 1157.

86. 147 U.S.App.D.C. 134, 452 F.2d 1363 at 1370.

87. Brown v. United States, 126 U.S.App. D.C. 134, 143, 375 F.2d 310, 319 (1967).

MacKINNON, Circuit Judge.

I concur in Judge Wilkey's dissent. As I read the Sixth Amendment, its guarantee of the "assistance of counsel in his defense" does not require that defense counsel be present when the Government attorney or investigator interviews witnesses, whether they are shown pictures of the defendant, other suspects, crime scenes, instruments of the crime, evidence of the crime or prior testimony, or there is other discussion of the relevant facts in the case. In any given case any one of these incidents might uncover evidence that would be "critical" for the defendant, but the requirement that counsel be present is restricted to legal proceedings and those instances where the defendant himself is physically present.

## The Sixth Amendment

In my view the majority opinion not only misreads the Sixth Amendment but also, in attempting to make its decision appear reasonable and workable, takes a very unrealistic view of the prosecution of criminal cases. It seems to believe that the investigation of a criminal case ceases with a grand jury indictment and that the FBI report is then wrapped with a blue ribbon which is not untied until the case comes on for trial. Far from it. An important criminal trial needs constant investigation. After a suspect is arrested, new witnesses may appear, new facts may appear and new theories may develop as additional facts become known. Such post-arrest developments may further incriminate the defendant and make his conviction more certain or they may lead to an acquittal or dismissal of the charges. The fact that an arrest has been made, or even that an indictment has been returned, is no justification for stopping the investigation. That is an ongoing thing right up until trial and frequently into the trial as the defense may then present new witnesses for the first time. The investigation may even continue after trial.

Under the majority opinion, after defendant's arrest the defense counsel would have to be notified every time a new or old witness was shown any photographs of the defendant or other suspects. This will constitute an unreasonable interference with post-arrest investigations and would require defense counsel to be present wherever such photographs may be shown by police or FBI personnel to any witness anywhere in the country.

Such requirement is wholly unreasonable and particularly so when applied nationwide as it must be if this is, as the majority say, a constitutional requirement. Even though we have a great many local crimes in the District of Columbia where identifications are completely local matters we cannot convert the Sixth Amendment into a provincial rule. We must recognize that, if the law is as stated by the majority, whenever any FBI agent interrogates any witness anywhere in the country after a suspect is arrested and has counsel, if the agent intends to exhibit any photograph of the accused, that defense counsel must be notified, be present, etc. Such requirement is completely unworkable and, in my view, particularly with respect to federal crimes, many of which involve interstate activity and hence out of state witnesses, is not required by the Constitution.

## The Identification of Ash

I also dissent from the failure of the majority opinion to recognize the full import of the identification testimony against Ash. It was not limited to "height, weight, age and build" as the majority opinion states (p. 97). In addition to the testimony as to height, tall, thin, shorter than the other, more muscular, slender, taller than the other, there was testimony that the suspects were: "not too dark complected" (Tr. 125); "light skinned negro" (Tr. 182); "neatly dressed" (Tr. 182); "extremely neat" (Tr. 182); [had a] "mustache" (Tr. 192); [wore] "no glasses" (Tr. 192,

220); wore masks. Also, the witness Betty Apple, who made a positive in-court identification of both men—she was "absolutely certain" and that there was no question in her mind (Tr. 220)—had seen the same two men ten minutes before she observed them outside the bank. At that time they were in a cream colored Pontiac convertible that was parked in front of her husband's restaurant about a block away from the bank (Tr. 213–214). They were then unmasked and she saw them ten minutes later, again unmasked, as they fled from the bank with one carrying a large paper bag. On both occasions she was seated in a parked car at the restaurant and bank respectively and had a good opportunity to identify the men. In front of the bank they passed within five feet of where she was seated in the car and her testimony is very valuable because she recognized (suspected) at the time, from their running and carrying a paper bag, that a bank robbery had been committed (Tr. 197, 221). She was thus alert to the consequences of what she was observing.

There was also other substantial evidence that fully corroborated the finding of the jury that Ash committed the crime. This was particularly the testimony of McFarland. While he had a criminal record and could benefit from Government favors, still the story he told had the ring of truth because of a number of recounted elements that a person could only have known if he had talked to some person who was knowledgeable about the details of the crime. That he had a criminal record does not disqualify him as a witness. The Government cannot pick and choose witnesses. In a criminal trial it must take its witnesses where it finds them and it is not unusual for it to find certain witnesses with criminal records who have knowledge of the criminal activities of others. That is but a fact of life. Criminals associate with other criminals. The Government cannot be expected or required to prove criminal conduct solely through witnesses who frequent houses of worship. Where known criminals testify against criminal defendants it is sufficient for the jury to know the record of the witnesses, as they did with respect to McFarland, to be properly instructed thereon and to give such testimony such weight as they consider proper under the circumstances. The weight of the testimony is for the jury.

### The Colored Photographs

Having said the foregoing, I find that the five colored photographs, which were shown to all the witnesses shortly before trial, were impermissibly suggestive. Photographs of only five individuals were shown at that time—one of each of the defendants and pictures of three other individuals. (There were three pictures of one of the other individuals.) From my personal examination of these exhibits viewed in the light of the full transcript, I find these pictures to have been impermissibly suggestive because *those of the defendants Ash and Bailey were the only photographs of tall slender men, which was the prior description of the robbery suspects by all the witnesses.* The other three pictures were all of men who appeared to be heavy and not tall. However, the court held a full hearing on all the identification testimony and in my opinion found that the witnesses had a sufficient independent source to make an in-court identification (Tr. 102–103). In support of this conclusion it is extremely significant to note that the testimony of the identification witnesses with respect to Ash was substantially consistent throughout. There was a slight variation between Betty Apple's in-court identification of Bailey and her identification in the courthouse corridor.[1] (*See* Appendix, which charts the various identifications by the principal witnesses.)

---

1. In this respect it differs from United States v. Gambrill, 146 U.S.App.D.C. 72, 449 F.2d 1148 (1971), where the witness' testimony at trial was substantially stronger than it had been prior to being shown single photographs of the suspects.

Thus, there is every reason to believe the testimony of the witnesses that they were relying upon their own independent recollection of what they had previously observed. If the photographic procedures were as suggestive as the majority contend, they failed to produce any demonstrable effect upon the testimony. It is pure speculation for the majority to suggest that the identification testimony might have been less strong than it was formerly if the colored photographs had not been shown. I thus find no basis for upsetting the finding of the trial court that the evidence was admissible.[2]

One factor that troubled me, on first reading the cold record, briefs and the majority opinion, was the fact that the Government showed facial pictures to two witnesses who had only observed the robbers while they were wearing stocking masks. Obviously, if a person has not seen one's face, it is the height of impermissible suggestion to exhibit facial pictures to him of a person that the exhibitor knows is a strong suspect. Under such circumstances implicit suggestion could also lurk merely in a normal lineup that did not display various individuals with a close range of physical features similar to those that had been observed. However, after my initial doubts as to the propriety of showing facial photos, further investigation disclosed sufficient facts for me to conclude that it was proper here to exhibit facial pictures to the witnesses. I reach this conclusion because, while there was testimony that both robbers had worn masks, they had worn *stocking* masks and, to the extent that it was covered by testimony, the masks only came down to a point "right under his nose" (Tr. 167, 182). This left the upper lip (mustache area) and chin areas completely exposed. The facial features below the mask which were exposed could be observed and so could the color of the skin. The two appellants here had distinctive features in this area—one a mustache—and the other an unusual-type chin.

I place no great significance on the failure of the witnesses to articulate the individual facial features that they observed. Looking at a person for the first time to many people is much like looking at a sunset or a painting. Unless the viewer is a trained observer his initial impression is inclined to be stated in total rather than fragmented impressions. And for many persons it is difficult, *particularly without specific questions being asked,* to articulate the separate features they retain in their mind of the complete features that make up their individual recollection of the complete physiognomy of the suspect.

Moreover, while there was no specific evidence on the point, it cannot be ruled out that the masks which were used here were made of *sheer* stockings which one could see through. Obviously those who were wearing the masks saw through them.[3] If those wearing the stockings as masks could see through them, then other persons could see some of their features through the thin fabric of the hose. Thus, other facial features above the upper lip might have been observed to some extent, albeit in a possibly slightly distorted state. So in view of the opportunity that the witnesses did have to view the facial features of the suspects, I find that it was entirely proper to show the facial photo-

2. While the admission of the identification testimony is a separate question, it is not without significance that defense counsel *stipulated* to the admission into evidence of the colored photographs (Tr. 418). They were defendant Bailey's exhibits (Tr. 418) and hardly a basis for the majority to find constitutional error against the Government in their admission.

3. One witness thought "there must have been holes for his eyes. I don't remember that" (Tr. 167). The other witness testified, "He had a stocking cap over his face" (Tr. 181). A third witness said he did not have a mask on in the bank "when I saw him" (Tr. 192). This apparently contradictory evidence might be reconciled since the three witnesses had different views of the robbers, at varying distances and at slightly different times.

**134**

graphs to the witnesses. In this respect, the cold record requires a close examination to find out the true situation. The majority opinion, in my view, does not reflect this.

To the extent that the majority opinion differs from the foregoing, I respectfully dissent therefrom.

Judge ROBB concurs with the views herein expressed.

## APPENDIX

| Witnesses to Offense of Aug. 26, 1965 | Observed Robbers | | Feb. 3, 1966 Black & White Photos | May 7, 1966 Color Photos | May 8, 1968 Trial Identification |
| | With Mask | Without Mask | | | |
|---|---|---|---|---|---|
| Mrs. Ruby Paugh (Teller) | X | | Not positive—identified | Selected Ash photo. Was not absolutely certain. Thinks this was him (Tr. 51) | Could make no definite identification—"looks similar" (Tr. 160) |
| Mrs. Jean Major (Teller) | X | | Not positive—identified | Selected Ash photo. (Tr. 45) Was not absolutely certain. Thinks this was him. (Tr. 52) | Believed Ash was gunman (Tr. 177, 182) "I have no doubt in my mind but I cannot say with absolute certainty" (Tr. 183) |
| Mr. Joseph Taylor (Pastor, customer) | | X | To best of his belief (Tr. 16) Ash was gunman, but he could say positively if he could see him in person. | Unable to identify color photo on May 8, 1968 (Tr. 47) | Looks sort of like the man I saw coming in (Tr. 188) Not "absolutely certain . . . it looks like him. I cannot be certain" (Tr. 194) |
| Betty Apple (Street observer) | | X [1] | [2] "Wasn't sure, it looked like [Ash]" (Tr. 16, 200) | Selected Ash photo. Was not sure. Believe photo was of the robber (Tr. 52, 201). Did not select photo of Bailey (Tr. 201) | Identified both defendants in person in court room (Tr. 197, 198) "With absolute certainty—there is no question in [my] mind" (Tr. 220) |

1. Observed both defendants one block away from bank ten minutes before robbery and ten minutes later in front of bank.

2. She had been shown photos on January 23, 1966 by policeman (Tr. 370).

On February 18, 1966, she had pointed out Bailey among 50 other persons in corridor of General Sessions Court Building (Tr. 72–74, 372). She "believed" Bailey was one of the men (Tr. 82).